# O'CONNOR PLAYDON & GUBEN LLP
A LIMITED LIABILITY LAW PARTNERSHIP

JERROLD K. GUBEN    3107-0
JEFFERY S. FLORES    8691-0
Makai Tower, 24th Floor
733 Bishop Street
Honolulu, Hawaii 96813
Telephone: (808) 524-8350
Facsimile: (808) 531-8628
jkg@opglaw.com
jsf@opglaw.com

Attorneys for Debtor
HAWAII BIOTECH, INC.

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>HAWAII BIOTECH, INC.,<br><br>                    Debtor. | Case No. 09-02908<br>(Chapter 11)<br><br>*Hearing:*<br>Date:<br>Time:<br>Judge:  Honorable Robert J. Faris |

## MOTION TO SELL ASSETS OF THE ESTATE FREE AND CLEAR OF ALL LIENS. CLAIMS AND ENCUMBRANCES, PURSUANT TO 11 U.S.C. § 363(b) and (f)

Hawaii Biotech, Inc., the Debtor, hereby moves this Court for an order authorizing the Debtor to sell the assets of the Estate free and clear of liens, claims and encumbrances, pursuant to 11 U.S.C. § 363(b) and (f), and to waive the stay pursuant to Rules 6004(h) and 6006(d).

219821v1\09-234\JKG

This Motion is filed pursuant to 11 U.S.C. § 363(b) and (f), Rule 6004, F.R.Bk.P., LBR 6004-1, the Declaration of Elliot Parks, the attached Memorandum and the Exhibits attached thereto and the files and pleadings in this case.

DATED: Honolulu, Hawaii, June 8, 2010.

JERROLD K. GUBEN
JEFFERY S. FLORES
Attorneys for Debtor
HAWAII BIOTECH, INC.

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed  06/08/10   Page 2 of 70

O'CONNOR PLAYDON & GUBEN LLP
A LIMITED LIABILITY LAW PARTNERSHIP

JERROLD K. GUBEN    3107-0
JEFFERY S. FLORES    8691-0
Makai Tower, 24th Floor
733 Bishop Street
Honolulu, Hawaii 96813
Telephone: (808) 524-8350
Facsimile: (808) 531-8628
jkg@opglaw.com
jsf@opglaw.com

Attorneys for Debtor
HAWAII BIOTECH, INC.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>HAWAII BIOTECH, INC.,<br><br>          Debtor. | Case No. 09-02908<br>(Chapter 11)<br><br>*Hearing:*<br>Date:<br>Time:<br>Judge: Honorable Robert J. Faris |

## MEMORANDUM IN SUPPORT OF MOTION;
## EXHIBITS A - D

Hawaii Biotech, Inc. ("HBI"), the Debtor, submits this Memorandum

in Support of its Motion to Sell Assets of the Estate Free and Clear of Liens,

Claims and Encumbrances, Pursuant to 11 U.S.C. § 363(b) and (f).

219821v1\09-234\JKG

# I. BACKGROUND

On December 11, 2009, HBI filed its petition for relief. At the time of the filing, the Debtor was engaged in the development and clinical trials of West Niles and Dengue Fever vaccines as well as research and pre-clinical development of other sub-unit vaccines. On December 31, 2009, the Court entered its Final Order Re: Debtor's Motion to Borrow Funds as Secured and Superpriority Administrative Expense Pursuant to § 364(c) and (d) of the Bankruptcy Code (Docket No. 88) (the "DIP Order"). The DIP Order authorized the Debtor-in-Possession lenders (the "Lender Group") to advance up to $2,025,000.00 secured by a post-petition lien on the Debtor's assets up to the amount actually advanced to support the Debtor-in-Possession's operations. As of May 31, 2010, the Lender Group had advanced $1,370,312.00 leaving approximately $654,688 of available credit under the $2,025,000.00 facility.

The latest Monthly Operating Report for the month of April 2010, shows the Debtor has $174,755.47 from the amounts advanced and the revenues generated from operations, although estimates as of June 1, 2010, indicate the Debtor is holding $200,000.00 in cash.

At the current rate of expenditures, the Debtor will not have sufficient funds to operate past July 31, 2010. A sale of the Debtor's assets is necessary and imperative to maintain and preserve its West Nile virus and Dengue vaccine

clinical trials and the value of its intellectual property ("IP"). These trials are supported by the executory contracts assumed by the Debtor. The Debtor has spent millions of dollars to develop and test these vaccines, and has gotten to the clinical phase where it has reach a stage where the vaccines are being tested on human subjects in trial at St. Louis University. In its ongoing efforts to conserve cash, the Debtor has recently reduced its operations by implementing a three day work week for all employees.

It is in the public interest, and in the interest of creditors, that the IP and the administration of the clinical trials be transferred to a party, with sufficient expertise and financial resources to continue with the trials and the development of the vaccines. The Debtor has decided that the only way to preserve the value of these assets and continue the research and development of its vaccine candidates is to sell the operations as a "going concern" in an auction to the highest bidder, possessing the qualifications to continue the scientific operations and trials and produce the vaccines.

## II.     ARGUMENT

### A.     A Debtor May Sell All or Almost All of its Assets in a Sale Prior to Confirmation of the Plan.

Section 363(b) allows a chapter 11 debtor to sell or almost all of its assets prior to the confirmation of a plan of reorganization.

U.S. Bankruptcy Court - Hawaii  #09-02908  Dkt # 137  Filed  06/08/10  Page 5 of 70

In <u>In re Wilde Horse Enterprises, Inc.</u>, 136 B.R. 830, 840-841 (Bankr.C.D.Cal. 1991), the court set out the standards for a sale of the business outside of the ordinary course of business and prior to the confirmation of a plan of reorganization;

> Under what circumstances should the debtor in possession be allowed to sale of all or virtually all of the estates property prior to the confirmation of debtor's plan? This was the fundamental question raised and discussed in <u>In re Lionel Corporation</u>, 722 F.2d 1063 (2nd Cir.1983). <u>Lionel</u>, stands for the notion, at least, that § 363(b) does not grant the bankruptcy judge *carte blanche* to approve any sale proposed by the debtor, but requires that "reasons be given for whatever determination is made", i.e. "[There must be some articulated business justification ... before the bankruptcy judge may order such disposition." The "notice and hearing" safeguard of § 363(b) would be meaningless if the court were not required to articulate some reasons why the sale is in the best interest of the estate.

> Of course, the court and the creditors can only make an "articulated business" judgment regarding the prudence of the sale where there has been a full disclosure of the details of the proposed sale by its proponent. "The key to the reorganization Chapter ... is *disclosure*...." The essential purpose served by disclosure is to ensure that parties in interest are not left entirely at the mercy of the debtor and others having special influence over debtor.

In the case at bar, the Debtor must sell its assets before July 31, 2010, when the Debtor expects to run out of operating funds to pay its rent, its employees and the parties performing its clinical trials. The Debtor has moved to extend the

time to assume or reject the lease at 99-193 Aiea Heights Drive, Suite 200, Honolulu, Hawaii, to July 9, 2010, and which lease expires on August 31, 2010. The Debtor is current on its post-petition rent through April 2010, but is having trouble meeting its current lease rent. The Debtor may be able to pay some portion of the current rent, per the present lease through July 31, 2010. The Debtor's additional problems are set forth in the Declaration of Elliot Parks, chief executive officer of the Debtor, who describes the Debtor's financial problems, its reduction of hours for its employees and the payment of the clinical trials.

In this case, the Debtor can sell its assets pursuant to § 363(b) because it meets the following conditions and standard as described in In re Wilde Horse Enterprises,

> In approving any sale outside the ordinary course of business, the court must not only articulate a sufficient business reason for the sale, it must further find it is in the best interest of the estate, i.e. it is fair and reasonable, that it has been given adequate marketing, that it has been negotiated and proposed in good faith, that the purchaser is proceeding in good faith, and that it is an "arms-length" transaction. Matter of Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr.Del.1987); In re Alpha Industries, Inc., 84 B.R. 703,705-06 (Bankr.Mont.1988); In re Alves, 52 B.R. 353 (Bankr.R.1.1985); In re Delaware & Hudson Railway Co., 124 B.R. 169, 176-77 (D.Del.1991); In re Planned Systems, Inc., 82 B.R. 919, 923 (Bankr.S.D.Ohio 1988). It is the proponent's duty to produce evidence probative of these issues. Finally, the court must determine that the debtor in possession has given all interested parties adequate and reasonable

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed  06/08/10   Page 7 of 70

notice regarding the sale. In re Delaware & Hudson Railway Co., 124 B.R. at 176.

This Court will schedule a hearing during the week of July 16, 2010, and will have an opportunity to review the process of sale, including the advertising and marketing of the Debtor, the bidding procedures and the actual sales price, including any credit bid as allowed by the bidding procedures.

**B.      The Sales Must be Free and Clear of All Liens and Encumbrances.**

The Debtor proposes to sell the assets of the Estate free and clear of all liens, claims and encumbrances, pursuant to § 363(f).

In January 2010, the Debtor, as per the court's Order, satisfied the pre-petition secured indebtedness in full and there remains no pre-petition liens or encumbrances on the Debtor's assets.

On December 31, 2009, this Court entered its Order granting a post-petition security interest to the Lender Group in an amount up to $2,025,000.00. The Lender Group has advanced $1,370,312.00 as of May 31, 2010, and the Debtor believes it will need additional funds to keep operations going through the proposed sale date, and has requested additional advances from the Lender Group.

In In re PW LLC, 391 B.R. 25 (9th Cir. BAP 2008) ("Clear Channel"), the Bankruptcy Appellate Panel held that a debtor can sell property free and clear if one or more of the provisions of § 363(f)(1) to (5) is satisfied. In this case, the

post-petition secured creditor, the Lender Group, has consented to the sale of the property, free and clear of their post-petition liens and security interest, which liens and encumbrances will be transferred to the sales proceeds, in the same validity, priority and extent that the post-petition Lender Group had as per the Order of December 31, 2009.

The Lender Group's consent to the sale of the Debtor's assets satisfies § 363(f)(2) and allows the Debtor to sell the assets, including the executory contracts previously assumed by this Court's Orders.

## C. The Sale Should be Made Subject to the Credit Bid of the Lender Group.

Section 363(k) allows a secured creditor, pre or post-petition to credit bid the full amount of their claim. See In re Monarch Beach Ventures Ltd., 166 B.R. 428 (C.D.Cal. 1993) and In re California Hancock Inc., 88 B.R. 226 (9th Cir. BAP 1988). In the case at bar, the Debtor proposes to allow the post-petition Lender Group, through its appointed agent, as per the Order of December 31, 2009, to credit bid up to the full amount of their claim, including all amounts advanced pursuant to the Order of December 31, 2009, up to the amount of $2,025,000.00, or the amount that is advanced to the Debtor on the auction date. The amount of the maximum credit bid of the Lender Group will be disclosed at the time of the auction, since the Debtor may continue to require additional funds up to the auction date.

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed 06/08/10   Page 9 of 70

The Lender Group will be deemed the "Stalking Horse" bidder with its bid of $1,445,312, the current principal amount outstanding under the DIP Loan, plus the cash amounts as set forth in the Asset Purchase Agreement. The Lender Group, as the Stalking Horse "bidder," will be entitled to an expense reimbursement as per the Asset Purchase Agreement in the event it is not the successful bidder at the auction.

### D.     The Auction Sale Qualifies for § 363(m) Designation.

Section 363(m) provides protection for the purchaser of the Debtor's assets from a later appeal unwinding the sale. In this case, the certainty of the sale for the ongoing clinical trials is essential. The sale qualifies for § 363(m), as per the Ninth Circuit Bankruptcy Appellate Panel standards set out in <u>In re PW, LLC</u>, 391 B.R. at 35-37. See also <u>In re Qintex Entertainment, Inc.</u>, 950 F.2d 1492, 1497-1498 (9th Cir. 1991) (arms-length requirement and not in violation of any good faith requirement of the Code).

### E.     The Auction Procedures.

The Debtor proposes to auction off all of the assets of the Estate to the highest "qualified" bidder. Because time is of the essence, insofar as the Debtor is running short on its post-petition funding, the Debtor proposes to conduct an in-court auction the week of July 16, 2010. <u>See</u> Exhibit A-D.

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed  06/08/10   Page 10 of 70

The sale will proceed on the following conditions and qualifications.

## 1. Qualification of Bidder

Because the Debtor is engaged in a business which is affected with the public interest, being the research, development and clinical testing of prophylactic infection disease vaccines, including both the West Nile and Dengue Fever vaccines, all bidders must have previous management and demonstrate current expertise (including an experienced management team) in the operation of development-stage companies in the human vaccines industry. HBI wants to make sure that the successful bidder will be able to continue to carry out the on-going development and trials of both the West Nile and Dengue Fever vaccines.

To assure that the bidders are qualified prospective bidders, the Debtor will require that all bidders submit their qualifications to carry forward with the mission of HBI for the West Nile and Dengue Fever vaccines. The Debtor's staff, including the Chief Executive Officer, Dr. Elliot Parks, will work with his associates in pre-qualifying the bidders for the auction sale.

## 2. Due Diligence

The Debtor is selling its assets without warranties and representations. The prospective bidders will have an opportunity to conduct due diligence of the Debtor's operations. The Debtor has prepared a "Due Diligence Package" of

U.S. Bankruptcy Court - Hawaii  #09-02908  Dkt # 137  Filed 06/08/10  Page 11 of 70

materials, which is available via electronic data room. The first level of access concerning certain key assets is attached as Exhibit B.

To review the more confidential and proprietary information, prospective bidders will be required to sign the Confidentiality Agreement, attached as Exhibit C.

The execution of the Confidentiality Agreement will be required to have access to the information.

### 3.    Bidding.

Minimum Deposit.

The Debtor will require a $200,000.00 refundable deposit to qualify for the in-court auction. The refundable deposit will be returned to unsuccessful bidders, but will be applied to the purchase price if a bidder is successful.

The Lender Group, as Stalking Horse Bidder, will not be required to post a pre-qualifying $200,000.00, but their DIP Loan will serve as the qualifying deposit.

Cash Payments.

The Lender Group will be allowed to credit bid up to the full amount of the DIP loans and advanced by the time of the auction. All bidders, will have to bid at least enough in cash to pay certain administrative expenses, including professional fees and all amounts necessary to assume the executory contracts

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed  06/08/10   Page 12 of 70

previously assumed by the Debtor, as well as any other executory contracts or leases to be assumed and assigned.

Procedures.

The initial required overbid amount will be $1,630,312, be a qualified bid. The bidding will proceed in $200,000.00 increments, whether by cash or credit bid. The highest and best bid will be submitted to the United States Bankruptcy Court for the District of Hawaii for confirmation. If the successful bidder is unable to close timely, then the second highest bidder will be designated the "back-up bidder" and will be able to purchase the property at the "back-up bid" price.

The Lender Group has prepared and provided to the Debtor an Asset Purchase Agreement before the auction in the form attached hereto as Exhibit D. The Asset Purchase Agreement will be made available for comments to the prospective bidders and subject to minor modifications to satisfy the considerations of the Debtor and successful bidder.

## III.  CONCLUSION

Hawaii Biotech, Inc., requests this Court approve and authorize the sale of the assets of Hawaii Biotech, Inc., free and clear of all liens, claims, and encumbrances, subject to a credit bid by the Lender Group, on the conditions set forth herein.

DATED:  Honolulu, Hawaii,  June 8, 2010.

JERROLD K. GUBEN
JEFFERY S. FLORES
Attorneys for Debtor
HAWAII BIOTECH, INC.

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed  06/08/10   Page 14 of 70

# Exhibit A

Exhibit A

# BID PROCEDURES[1]

Set forth below are the bid procedures (the "Bid Procedures") to be employed by Hawaii Biotech, Inc. (the "Debtor") for the sale (the "Transaction") of Debtor's assets and operations (the "Purchased Assets"). The Transaction will be implemented through a purchase agreement (the "Asset Purchase Agreement") with HBI Acquisition Corp. (the "Buyer"), subject to the receipt of higher or otherwise better bids according to these Bid Procedures.

<table>
<tr><td colspan="2" align="center">**Important Dates**</td></tr>
<tr><td>•</td><td>**June 14, 2010:** Proposed date of Bid Procedures Hearing</td></tr>
<tr><td>•</td><td>**June __, 2010:** Debtors to send Cure Notices to All Contract Counterparties</td></tr>
<tr><td>•</td><td>**June __, 2010:** Debtors to send Contract Assignment Notices to Counterparties to Assigned Contracts</td></tr>
<tr><td>•</td><td>**July __, 2010:** Cure Objection Deadline</td></tr>
<tr><td>•</td><td>**July __, 2010:** Deadline to submit Bid to be considered for the Auction</td></tr>
<tr><td>•</td><td>**July __, 2010:** Deadline for Counterparties to Assigned Contracts to object to assignment</td></tr>
<tr><td>•</td><td>**July __, 2010:** Deadline to file and serve objections to relief requested at Sale Hearing</td></tr>
<tr><td>•</td><td>**July __, 2010:** Proposed date of Auction</td></tr>
<tr><td>•</td><td>**July __, 2010:** Proposed date of Sale Hearing</td></tr>
</table>

## Approval of Bid Procedures and Bid Protections

Debtor shall request that the Bankruptcy Court set a hearing (the "Bid Procedures Hearing") to occur on or before June 14, 2010, among other things, to enter an order (the "Bid Procedures Order") approving the Bid Procedures and the bid protections set forth in the Asset Purchase Agreement (the "Bid Protections").

### *Access to Diligence Materials*

- To participate in the bidding process and receive access to diligence materials (the "Diligence Materials"), a party must submit an executed confidentiality agreement, in the

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Asset Purchase Agreement.

form attached hereto as Exhibit 1 (the "Confidentiality Agreement"). A party who qualifies for access to Diligence Materials shall be a "Preliminarily Interested Party."

- All due diligence requests must be directed to _____.

- For Preliminary Interested Parties who are competitors of Debtor or who are affiliated with competitors of Debtor, Debtor reserves the right to withhold any Diligence Materials that Debtor determines, in its sole discretion, are business-sensitive or otherwise not appropriate for disclosure to such Preliminary Interested Party.

### *Updates Regarding Marketing Process*

Debtor shall provide the Buyer with daily telephonic reports of all expressions of interest, and offers received, and shall provide the Buyer with complete copies of all such offers.

### Auction Qualification Process

Each offer, solicitation, or proposal (other than an offer, solicitation or proposal from the Buyer) (each, a "Bid") and each party (other than the Buyer) submitting such a Bid (each, a "Bidder") must satisfy the conditions listed below to be eligible to participate in the Auction. Debtor, in its sole discretion, shall determine compliance with each condition.

### *Conditions*:

<u>(a)</u>  Experience in Vaccine Development: Each Bid must be accompanied by written evidence that the Bidder has existing expertise and knowledge to continue to carry out and complete the on-going development and clinical trials of all of the Debtor's vaccines.

(a)  Good Faith Deposit: A Bid must be accompanied by a deposit in the amount of $200,000 to an escrow account to be identified and established by Debtor (the "Good Faith Deposit").

(b)  Higher or Otherwise Better Terms: A Bid must be on terms that are higher or otherwise better than the terms of the Asset Purchase Agreement.

(c)  Documentation: A Bid must include (i) executed transaction documents (the "Competing Transaction Documents") to effect an offer to compete against the Buyer's proposal (a "Competing Transaction") and (ii) a copy of the Asset Purchase Agreement marked to show all changes requested by the Bidder (including those related to the purchase price).

(d)  Purchase Price; Related Terms: A Bid must propose a purchase price of at least $1,700,000, reflecting the Buyer's Purchase Price, plus the $75,000 Expense Reimbursement payable under the Asset Purchase Agreement, plus an initial bid increment of $100,000. No Bidder, other than the Buyer, shall be entitled to any expense reimbursement, breakup fee, termination fee, or similar fee or payment.

2

(e)    Executory Contracts and Leases: Competing Transaction Documents shall identify all of Debtor's executory contracts and unexpired leases that the Bidder wishes to have assumed and assigned to it pursuant to the Competing Transaction (collectively, the "Assigned Contracts").

(f)    Corporate Authority: A Bid must include written evidence that demonstrates appropriate corporate authorization for the Bidder to consummate the proposed Competing Transaction; provided, that if the Bidder is an entity specially formed for the purpose of effecting the Competing Transaction, then the Bidder must furnish written evidence of the approval of the Competing Transaction by the equity holder(s) of such Bidder.

(g)    Proof of Financial Ability to Perform: A Bid must include written evidence that the Bidder has the necessary financial ability to close the Competing Transaction and provide adequate assurance of future performance under all executory contracts and leases to be assumed and assigned in such Competing Transaction. Such information should include, among other things, the following:

    (i)    contact names and numbers for verification of financing sources,

    (ii)    evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the Competing Transaction;

    (iii)    the Bidder's current financial statements (audited if they exist); and

    (iv)    any such other form of financial disclosure or credit-quality support information or enhancement, acceptable to Debtor in its sole discretion, that demonstrates such Bidder is able to close the Competing Transaction.

(h)    Contingencies: A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence.

(i)    Irrevocable: A Bid must be irrevocable through the Auction and must continue to remain irrevocable, subject to the terms and conditions of these Bid Procedures.

(j)    Bid Deadline: Regardless of when a party qualifies as a Preliminarily Interested Party, all Bids must be in writing and received by Debtor on or before 5:00 p.m. (prevailing Hawaii time) on July __, 2010 (the "Bid Deadline").

Bids received from Bidders on or before the Bid Deadline that are determined by Debtor to meet the above requirements shall constitute "Qualified Bids," and such Bidders shall constitute "Qualified Bidders." The Buyer shall be deemed a Qualified Bidder without compliance with the above requirements. Only Qualified Bidders may participate at the Auction.

### Auction

If more than one Qualified Bid (including the Asset Purchase Agreement) is received by the Bid Deadline, Debtor will conduct an auction (the "Auction") to determine the highest or

3

otherwise best Qualified Bid. Debtor, will determine the highest or otherwise best Qualified Bid in its business judgment, after taking into account any factors Debtor deems relevant, including, without limitation, the following criteria (the "Bid Assessment Criteria"):

(i)     the amount and nature of the consideration;

(ii)    the proposed assumption of any liabilities, if any;

(iii)   the ability of the Qualified Bidder to close the proposed Transaction;

(iv)    the proposed closing date and the likelihood, extent, and impact of any potential delays in closing;

(v)     any purchase price (or similar) adjustments;

(vi)    the impact of the Transaction on any actual or potential litigation; and

(vii)   the net after-tax consideration to be received by Debtor's estate.

If no Qualified Bid (other than the Asset Purchase Agreement) is received by the Bid Deadline, Debtor will not conduct the Auction.

The Auction shall take place at a recess during the Sale Hearing or such later time on such day or other place as Debtor shall notify all Bidders who have submitted Qualified Bids. The Auction shall be conducted according to the following procedures:

(a)     Debtor Shall Conduct the Auction.

Debtor and its professionals shall direct and preside over the Auction.

At the start of the Auction, Debtor shall describe the terms of the Asset Purchase Agreement or, if a higher or otherwise better Qualified Bid is received, such Qualified Bid (the "Auction Baseline Bid").

All Bids made thereafter shall be Overbids (as defined below), shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all Bidders who have submitted Qualified Bids. The Buyer shall be permitted to credit bid the full amount of the Post-Petition Loan (including all unpaid interest, fees, costs, etc., due and owing on the date of the Auction, collectively, the "Loan Amount"), and the Expense Reimbursement as part of any Overbid in connection with each round of bidding. Debtor shall maintain a transcript of all bids made and announced at the Auction, including the Auction Baseline Bid and all Overbids.

(b)     Terms of Overbids.

An "Overbid" is any bid made at the Auction subsequent to the Debtor's announcement of the Auction Baseline Bid. The Buyer may, but is not required to, make an Overbid. To

4

submit an Overbid for purposes of the Auction, a Bidder must comply with the following conditions:

(i)    *Minimum Overbid Increment*.

Any Overbid after the Auction Baseline Bid shall be made in $100,000 increments. Additional consideration in excess of the amount set forth in the Auction Baseline Bid shall include only cash, and, in the case of the Buyer, a credit bid of the Loan Amount and any Expense Reimbursement, in any combination.

(ii)    *Remaining Terms are the Same as for Qualified Bids*.

Except as set forth in the Asset Purchase Agreement, any Overbid must remain open and binding on the Bidder until and unless Debtor accepts a higher or otherwise better Overbid and subject to the procedures with respect to Backup Bids (as described below).

To the extent not previously provided (which shall be determined by Debtor), a Bidder submitting an Overbid (other than the Buyer) must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement acceptable to Debtor) demonstrating such Bidder's ability to close the Competing Transaction proposed by such Overbid.

(iii)    *Announcing Overbids*.

Debtor shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid, and the resulting benefit to Debtor's estate based on, among other things, the Bid Assessment Criteria.

(iv)    *Consideration of Overbids*.

Debtor shall have the right to declare one or more adjournments in the Auction. Debtor may declare adjournments to, among other things: (1) facilitate discussions between Debtor and individual Bidders; (2) allow individual Bidders to consider how they wish to proceed; and (3) give Bidders the opportunity to provide Debtor with such additional evidence as Debtor may require that the Bidder has sufficient internal resources, or has received sufficient non- contingent debt and/or equity funding commitments, to consummate the proposed Competing Transaction at the prevailing Overbid amount.

(c)    Backup Bidder.

Notwithstanding anything in the Bid Procedures to the contrary, if an Auction is conducted, the party Debtor determines to have the next highest or otherwise best Qualified Bid at the Auction shall be required to serve as a backup bidder (the "Backup Bidder"); provided, that the Buyer shall not be designated as the Backup Bidder absent the Buyer's written consent or agreement on the record. If the Buyer, but for the preceding clause, would otherwise be the Backup Bidder, the party the Debtor determines to have the next highest or otherwise best Qualified Bid at the Auction after the Buyer shall be required to serve as the Backup Bidder. The Backup Bidder shall be required to keep its initial Qualified Bid (or if the Backup Bidder

5

submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until the earlier of 5:00 p.m. (prevailing Hawaii time) on the date that is forty-five (45) days after the date of the Auction (the "Outside Backup Date") or the closing of the transaction with the Successful Bidder.

Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Transaction, because of a breach or failure to perform on the part of such Successful Bidder, Debtor may designate the Backup Bidder to be the new Successful Bidder, and Debtor will be authorized (but not required) to consummate the Transaction proposed in such Backup Bid without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit shall be forfeited to Debtor, and Debtor specifically reserves the right to seek all available damages from the defaulting Successful Bidder. The deposit of the Backup Bidder shall be held by Debtor until the earlier of twenty-four (24) hours after (i) the closing of the transaction with the Successful Bidder and (ii) the Outside Backup Date.

(d)     Additional Procedures.

Debtor may announce at the Auction additional procedural rules (e.g., the amount of time to make subsequent Overbids) for conducting the Auction so long as the rules are not inconsistent with these Bid Procedures or the Asset Purchase Agreement.

(e)     Consent to Jurisdiction as Condition to Bidding.

The Buyer and all Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Asset Purchase Agreement, the Auction, or the construction and enforcement of any Competing Transaction Documents.

(f)     Closing the Auction.

Debtor shall continue the Auction until there is only one Qualified Bid that Debtor determines in its sole discretion is the highest or otherwise best Qualified Bid at the Auction (the "Successful Bid," and the Bidder submitting such Successful Bid, the "Successful Bidder"). In making this decision, Debtor shall consider, among other things, the Bid Assessment Criteria. The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity, as determined by Debtor in its sole discretion to submit an Overbid at the Auction to the then-existing Overbid and the Successful Bidder has submitted fully executed transaction documents memorializing the terms of the Successful Bid.

Debtor shall not consider any bids submitted after the conclusion of the Auction.

## Procedures for Determining Cure Amounts and
## Adequate Assurance for Counterparties to Assigned Contracts

By June ___, 2010, the Debtors shall send a notice to each counterparty to an executory contract or unexpired lease (each, a "Contract Counterparty") setting forth the Debtors' calculation of the cure amount, if any, that would be owing to such counterparty if the Debtors

6

decided to assume or assume and assign such executory contract or unexpired lease (each, a "Cure Notice"). Any Contract Counterparty that objects to the amount set forth in the Cure Notice must file an objection (a "Cure Objection"), on or before 4:00 p.m. prevailing Hawaii Time on July __, 2010, which Cure Objection must be served on (i) counsel for the Debtors, O'Connor Playdon & Guben LLP, Pacific Guardian Center – Makai Tower, 733 Bishop St. – 24th Floor, Honolulu HI 96813, Attn: Jerrold K. Guben; (ii) counsel to Buyer (a) McCorriston Miller Mukai MacKinnon LLP, Five Waterfront Plaza, 4th Floor, 500 Ala Moana Boulevard, Honolulu, Hawaii 96813, Attn: Stewart Pressman and (b) Cooley LLP, 101 California Street, 5th Floor, San Francisco, California 94111, Attn: Robert L. Eisenbach III; and (iv) counsel to any statutory committees appointed in the Debtor's chapter 11 case (collectively, the "Service Parties") so that it is actually received no later than 4:00 p.m. prevailing Hawaii Time on July __ , 2010. If a Contract Counterparty does not timely file and serve a Cure Objection with respect to a Cure Notice, such Contract Counterparty will be forever barred from objecting to the cure amount proposed in such Cure Notice. If a Contract Counterparty files a timely Cure Objection and the parties are unable to consensually resolve the dispute, a hearing on such Cure Objection will be held at or prior to the Sale Hearing.

By July __ , 2010, the Debtor will send a notice via overnight delivery to each counterparty (each, an "Assigned Counterparty") to a contract designated as an Assigned Contract in the Asset Purchase Agreement (a "Contract Assignment Notice"). The Contract Assignment Notice will contain (i) reasonable detail of the proposed Assigned Contract and (ii) information regarding adequate assurance of future performance by the Buyer. Any Assigned Counterparty that objects to the assignment of its Assigned Contract or to the adequate assurance of the Buyer's ability to perform must file an objection (an "Assignment Objection") on or before 4:00 p.m. prevailing Hawaii Time on July __, 2010, which Assignment Objection must be served on the Service Parties so that it is actually received no later than 4:00 p.m. (prevailing Hawaii time) on July __, 2010. If an Assigned Counterparty does not timely file and serve an Assignment Objection, such Assigned Counterparty will be (i) forever barred from objecting to the assignment of their Assigned Contracts to the Buyer; (ii) deemed to have waived all pre-closing defaults and breaches under the Assigned Contracts; (iii) forever barred from objecting to the Buyer's adequate assurance of future performance, and (iv) deemed to have consented, for all purposes, to the assumption and assignment of their Assigned Contracts to the Buyer. If an Assigned Counterparty files a timely Assignment Objection and the parties are unable to consensually resolve the dispute, a hearing on the Assignment Objection will be held at the Sale Hearing.

If the Buyer is not the Successful Bidder at the Auction, then no later than five (5) business days after the Auction, the Debtors will send a subsequent Contract Assignment Notice to each counterparty to a contract designated as an Assigned Contract by the Successful Bidder or the Backup Bidder identifying the Successful Bidder and the Backup Bidder and providing information regarding adequate assurance of future performance by the Successful Bidder and the Backup Bidder. The Sale Order will address the procedures by which the Debtors will assume and assign the Assigned Contracts to a Successful Bidder or Backup Bidder that is not the Buyer.

Nothing shall affect the rights of the Successful Bidder to add or remove executory contracts and unexpired leases from the list of Assigned Contracts prior to the Sale Hearing. The

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed 06/08/10   Page 22 of 70

Debtors shall file a list of the Assigned Contracts to be assumed and assigned to the Successful Bidder at the Sale Hearing with the Court on or before the date of the Sale Hearing.

## Sale Hearing

Debtor will seek a hearing (the "Sale Hearing") on or before July __, 2010, at which Debtor will, during a recess, conduct the Auction and, following the Auction, seek approval of the Transaction with the Successful Bidder. Any objections to the sale of the Purchased Assets to the Successful Bidder or Backup Bidder must be filed on or before 12:00 p.m. (prevailing Hawaii time) on July __, 2010, and served on the Service Parties so that they are actually received by no later than 12:00 p.m. (prevailing Hawaii time) on July __, 2010.

## Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by Debtor, but shall not become property of Debtor's estate absent further order of the Court. The Good Faith Deposits of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than two (2) business days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder shall be returned to the Backup Bidder on the date that is the earlier of twenty-four (24) hours after (i) the closing of the Transaction with the Successful Bidder, and (ii) the Outside Backup Date. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Successful Bidder timely closes the winning transaction, its Good Faith Deposit shall be credited towards its purchase price.

8

**Exhibit 1**

**Confidentiality Agreement**

1180088 v45/SF

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed  06/08/10   Page 24 of 70

# Exhibit B

# Exhibit B

# Issued Patents Owned by HBI

| Patent # | Where Issued | Date Issued | Lawyer Ref # | Patent Name | Inventors | Notes | Priority Date |
|---|---|---|---|---|---|---|---|
| 5695965 | U.S. | 12/9/1997 | HABI.004.01 | Neurospora Expression System | Stuart, Ivy, Koo | Licensed to Neugenesis 07/2007 | 6/2/92 |
| 5118607 | U.S. | 6/2/1992 | HABI.003.01 | Non-Aqueous Solvent Specific Binding Protein Assays | Bignami, Grothaus | Abandoned early 2002 | n/a |
| 5364531 | U.S. | 11/15/1994 | HABI.005.01 | Process for Affinity Purification by Immunoadsorption in Non-Aqueous solvent | Bignami, Grothaus | Abandoned early 2002 | n/a |
| 716676 | Australia | 6/15/2000 | MF 24733-20003.41 (ID#8) | Subunit Vaccine Against Flavivirus Infection | Ivy, Nakano, Clements | Australian Pat. Appl. #60239/96 | 5/24/95 |
| 2224724 | Canada | 12/04/2007 | MF 24733-20003.42 | Subunit Vaccine Against Flavivirus Infection | Ivy, Nakano, Clements | CA App. 2,224,724 | 5/24/95 |
| 6136561 | U.S. | 10/24/2000 | MF 24733-20003.02 | Methods of Preparing Carboxy-Terminally Truncated Recombinant Flavivirus Envelope Glycoproteins Employing Drosophila Melanogaster Expression Systems | Ivy, Nakano, Clements | US Pat Applic 08/937,195 | 5/24/95 |
| 6165477 | U.S. | 12/26/2000 | MF 24733-20003.03 | Subunit Immunogenic Composition Against Dengue Infection | Ivy et al | US Pat Applic 09/639,950 | 5/24/95 |
| 0836482 | Europe | 11/13/2002 | MF 24733-20003.43 | Subunit Vaccine Against Flavivirus Infection | Ivy et al | Eur. pat appl #96917828.4 | 5/24/95 |
| 6416763 | U.S. | 7/9/2002 | MF 24733-20006.00 | Recombinant Nonstructural Protein Subunit Vaccine Against Flaviviral Infection | McDonell et al | U.S. Pat Appl # 09/143,077 | 8/28/98 |
| 6432411 | U.S. | 8/13/2002 | MF 24733-20008.00 | Recombinant Envelope Vaccine Against Flavivirus Infection | Ivy et al | U.S. Pat Appl # 09/352387 | 7/13/99 |
| 6329191 | U.S. | 12/11/2001 | MF 24733-20002.00 | DNA Encoding Recombinant Coffee Bean Alpha-Galactosidase | Ivy and Clements | U.S. Pat Appl # 08/113,890 | 8/30/93 |
| 0722336 | Europe | 8/6/2008 | a-Gal.EP.41 (MF 24733-20002.41) | DNA Encoding Recombinant Coffee Bean Alpha-Galactosidase | Ivy and Clements | EP Appl 94926627.4 | 8/30/93 |
| 6569636 | U.S. | 5/27/2003 | MF 24733-20007.00 | Assay for Modulators of Metalloenzyme Activity | Grothaus et al | Abandoned in 2006 | 5/27/99 |
| 758361 | Australia | 7/3/2003 | MF 24733-20006.41 | Recombinant Nonstructural Protein Subunit Vaccine Against Flaviviral Infection | McDonnell et al | Australian Pat. Appl #57907/99 | 8/28/98 |
| 752191 | Australia | 1/23/2003 | MF 24733-20005.41 | Recombinant Dimeric Envelope Vaccine against Flaviviral Infection | Peters et al | Australian Pat. Appl #85905/98 B2 | 7/1/97 |
| 6682909 | U.S. | 1/27/2004 | HBIHCV | Immunogenic Composition of Hepatitis C and Methods of Use Thereof | Nakano, et al | Reinstated 9/26/2008 | 9/13/01 |
| 6749857 | US | 6/15/2004 | MF 24733-20005.20 | Recombinant Dimeric Envelope Vaccine Against Flaviviral Infection | Peters, et al | US Pat Appl # 09/376463 | 8/18/99 |
| 1005363 | Europe | 3/29/2006 | DN.80E2.EP.05 | Recombinant Dimeric Envelope Vaccine Against Flaviviral | Peters, et al | EP App. No. 98937117.4 | 7/31/97 |

| Patents Issued | | | | | | | |
|---|---|---|---|---|---|---|---|
| Patent # | Where Issued | Date Issued | Lawyer Ref # | Patent Name | Inventor | Notes | Priority Date |
| | | | | Infection | | | |
| 2002300271 | Australia | 5/19/2006 | DN.80E2.AU.05 | Recombinant Dimeric Envelope Vaccine Against Flaviviral Infection | Peters, et al | Div. of AU 752191 | 7/31/97 |
| 254657 | Mexico | 2/13/2008 | DN.80E2.MX.47 | Recombinant Dimeric Envelope Vaccine Against Flaviviral Infection | Peters, et al | | 7/31/97 |

## Issued patents Owned by Avantogen, Inc.

| Patents Issued | | | | | | | |
|---|---|---|---|---|---|---|---|
| Patent # | Where Issued | Date Issued | Lawyer Ref # | Patent Name | Inventors | Notes | Priority Date |
| 5977081 | U.S. | 11/2/1999 | 1635.0010002 | Triterpene Analogs Having Adjuvant and Immunostimulatory Activity | Marciani | GPI-0100 Adjuvant | 5/20/97 |
| 6080725 | U.S. | 6/27/2000 | 1635.0010003 | Immunostimulating & Vaccine Compositions Employing Saponin Analog Adjuvants & Uses Thereof | Marciani | GPI-0100 Adjuvant | 5/20/97 |
| 0996451 | Europe | 1/5/2005 | 1635.001EP02 | Triterpene Analogs Having Adjuvant and Immunostimulatory Activity | Marciani | GPI-0100 Adjuvant | 5/20/97 |
| 2290646 | Canada | 3/11/2008 | 1635.001CA02 | Triterpene Analogs Having Adjuvant and Immunostimulatory Activity | Marciani | GPI-0100 Adjuvant | 5/20/97 |
| 732856 | Australia | 8/16/2001 | 1635.001AU02 | Triterpene Analogs Having Adjuvant and Immunostimulatory Activity | Marciani | GPI-0100 Adjuvant | 5/20/97 |
| 132886 | Israel | 5/12/2007 | 1635.001IL02 | A Non-Acylated or De-acylated Triterpene Saponin-Lipophile Conjugate, a Pharmaceutical Composition Containing the Same and a Vaccine Containing the Same | Marciani | GPI-0100 Adjuvant | 5/20/97 |
| 578317 | Korea | 5/3/2006 | 1635.001KR02 | Triterpene Analogs Having Adjuvant and Immunostimulatory Activity | Marciani | GPI-0100 Adjuvant | 5/20/98 |
| 230292 | Mexico | 9/2/2005 | 1635.001MX02 | Triterpene Analogs Having Adjuvant and Immunostimulatory Activity | Marciani | GPI-0100 Adjuvant | 5/20/98 |
| 500779 | New Zealand | 10/9/2001 | 1635.001NZ02 | Triterpene Analogs Having Adjuvant and Immunostimulatory Activity | Marciani | GPI-0100 Adjuvant | 5/20/97 |
| 68878 | Singapore | 4/2/2002 | 1635.001SG02 | Triterpene Analogs Having Adjuvant and Immunostimulatory Activity | Marciani | GPI-0100 Adjuvant | 5/20/97 |
| 6960344 | U.S. | 11/1/2005 | 1635.0060003 | Use of Imine-Forming Polysaccharides as Adjuvants and Immunostimulants | Marciani | GPI-0200 Abandoned | 10/3/97 |
| 7196073 | U.S. | 3/27/2007 | 1635.0060004 | Imine-Forming Polysaccharides Adjuvants and Immunostimulants | Marciani | GPI-0200 Abandoned | 10/3/97 |
| 1027061 | Europe | 5/25/2005 | 1635.006EP01 | Imine-Forming Polysaccharides, Preparation Thereof and the Use Thereof as Adjuvants and Immunostimulants | Marciani | GPI-0200 Abandoned | 10/3/97 |
| KR06800 | Korea | 2/1/2007 | 1635.006KR01 | Imine-Forming Polysaccharides, | Marciani | GPI-0200 | 10/3/97 |

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed  06/08/10   Page 27 of 70

| Patents Issued | | | | | | | |
|---|---|---|---|---|---|---|---|
| Patent # | Where Issued | Date Issued | Lawyer Ref # | Patent Name | Inventors | Notes | Priority Date |
| 14 | | | | Preparation Thereof and the Use Thereof as Adjuvants and Immunostimulants | | Abandoned | |
| 71994 | Singapore | 4/30/2002 | 1635.006SG01 | Imine-Forming Polysaccharides, Preparation Thereof and the Use Thereof as Adjuvants and Immunostimulants | Marciani | GPI-0200 Lapsed | 10/3/97 |
| 6573245 | US | 6/3/2003 | 1635.0070001 | Modified Polysaccharide Adjuvant-Protein Antigen Conjugates, the Preparation Thereof and Use Thereof | Marciani | GPI-0200 Abandoned | 4/28/98 |
| 6262029 | US | 7/17/2001 | 1635.0090001 | Chemically Modified Acylated Saponins and The Use Thereof as Adjuvants | Marciani & Press | GPI-0300 Abandoned | 8/14/98 |

## Equipment Leases:

| Description of lease items | Lessor | Lease # |
|---|---|---|
| Lab Equipment | Balboa/CIT Tech Financial Services | 902-0040883-000/35968-005 |
| Web Server/Ebola Lab Equipment | Balboa Capital | 35968-001 |
| Coulter Counter/ Freezer/ Centrifuge/ Incubators/ Printer/ Phone Console | Balboa Capital/GE Capital | 35968-003/4182033-001 |
| Lab equipment | Balboa Capital | 35968-006 |
| Lab equipment | Balboa Capital | 35968-008 |
| Furniture | Marlin Leasing | 001-0124307-006 |
| Bioreactor | Healthcare Fin. Svc. (US Bancorp) | 500-0033441-000 |
| Lab equipment | Balboa Capital | 35968-011 |
| Computer equipment | GE Capital | 4336859-001 |
| Copier | Lanier | 001-2389016-100 |
| Lab equipment | TCF Express Leasing | 002-0139153-300 |
| Lab benches | Butler Capital | 27441LD04 |
| Computer equipment | Dell Financial | 001-6065253-025 |
| Sony VAIO projector | GE Capital | 4336859-002 |
| Computer backup system | CIT Technology | 062-0001754-000 |
| Lab equipment | Manifest Funding | 600-0002102-000 |
| Software | Manifest Funding | 600-0002105-000 |

### A.     In-Licenses:

1.    Patent License from NIH for dengue antigens in diagnostics, dated 2/22/99

2.    Nonexclusive license from SmithKline Beecham Corp for expression system, dated 12/10/01

3.    Nonexclusive license from Invitrogen and GlaxoSmithKline for certain diagnostic products and test kits, dated 8/29/02

4.    University of Hawaii, for co-development of Malaria antigens, dated 4/16/10

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed   06/08/10   Page 28 of 70

5.   NIH non-exclusive for WN chimeric for in-house use, dated 1/18/06.

6.   Washington University, Evaluation & Option Agreement, for dengue antibodies, dated 2/15/10, ending 8/15/10.

## B.   Out-License:

1.   Exclusive License to Alere (fmly Inverness Medical Innovations and PanBio, Pty.) for use of dengue antigens as diagnostics, dated 3/15/00, amended 8/21/08, superseded to expand scope on 12/14/09.

2.   Exclusive license to ZymeQuest, Inc. for U.S. Patent App. 08/113,890, dated 11/30/99

3.   Exclusive License to Neugenesis Corporation for U.S. Patent 5,695,965, dated 07/16/07.

4.   License and Royalty Agreement, dated as of April 26, 2001, by and between Pfizer, Inc. and Galenica Pharmaceuticals, Inc. (assigned to Avantogen Inc.)

5.   License Agreement dated as of May 1, 2002, by and between Endocyte, Inc. and Galenica Pharmaceuticals, Inc. (assigned to Avantogen, Inc.)

## C.   In-Material Transfer Agreements for materials provided to Hawaii Biotech:

1.   FDA, Plasmid of JE genes, dated 10/4/96

2.   SmithKline Beecham (now GSK), Drosophila S2 expression system, dated 5/03/93

## D.   Research Agreements:

1.   Howard Hughes Medical Institute and the President and Fellows of Harvard College, Mutual Transfer related to flaviviruses E protein, dated 01/13/09 (This is a renewal of a prior agreement that expired 12/31/08 but removes Children's Hospital as a party.)

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed 06/08/10   Page 29 of 70

2. UTMB – (Dr. Freiberg), Sponsored research agreement for TBE vaccine development, dated, 7/1/09.

3. Research Corp. of Univ. of Hawaii, production and supply of Malaria protein constructs, dated 11/24/08

4. Johns Hopkins School of Public Health, pre-screening of clinical samples for dengue vaccine trial, dated 07/16/09

5. WRAIR CRADA Dengue, dated 9/20/02, last amended 6/4/09.

## E. Manufacturing & Clinical Development Agreements:

1. Cobra Biomanufacturing Plc. manufacturing West Nile and Dengue antigens, dated 2/21/05, as supplemented by that certain addendum dated as of 2/15/06 covering additional IAC column runs for WN80E, NS1 and Dengue antigen products, variation added 6/28/06 addition GLP suite for antibody production. Technical agreement, dated 4/7/06.

2. Biovest, production of 4G2 antibody (for Flaviviral Vaccine Purification), Master Service Agreement dated 9/7/05

3. Xcellerex, Manufacturing Service Agmt., Back-up Mfg of Flavivirus antigens, dated 8/1/06, Quality Agmt., dated 4/16/07

4. Althea Technologies, Inc. Drug Product Development and Clinical Supply Agreement, dated 6/25/07 Fill-Finish & Recovery Plan date 11/27/07, Quality Agreement, dated 6/25/07.

5. Almac Clinical Services, LLC., Master Agmt for Clinical Trial Services, Storage and Distribution of Clinical Trials Samples, dated 10/10/07

6. BioReliance, Master Service Agmt., master cell-bank production & testing, dated 12/23/08.

7. Blue Stream Laboratories, Lab Services Agreement dated 4/10/07.
8. Covance Clinical Research Unit, Master Clinical Development Services Agreement, dated 2/28/07.

9. Alere (IMIA, PanBio), Quality Agreement, dated 1/9/09.

10. MDS Pharma Services (soon to be Ricerca and fmly Skeletech), Master Services Agreement, dated 1/9/2004.

11. St. Louis Univ., Clinical Trials Agreement, dated 7/6/09 for Dengue 1 Ph I clinical trial.

## Section 2.12 (a)(iii):

(See also 2.12(a)(ii)(A) and (B))

A.    Out-Material Transfer Agreements for Research for materials provided by the Company (which MTAs do not contain any license or transfer of intellectual property or proprietary rights of the Company, including any derivative rights, other than the permission to use the material transferred thereunder):

1.    Walter Reed (MTA/CRADA), dengue antigens for research use, dated1/24/00 renewed agmt. 9/20/02 amended 2/20/04, 10/17/05, 12/20/05, 5/8/07, and 10/18/08

2.    U of Massachusetts Medical School, Dengue, dated 5/10/04 amended to include AFRIMS, dated 3/13/06, amended 9/11/06, amended 7/10/07, amended 9/28/07, and amended 3/3/08.

3.    Alere (fmly Inverness MIA and PANBIO Ltd), Japanese Encephalitis Virus Recombinant Antigen, 5/3/04, 8/16/05

4.    University of Hawaii: Dr. Hui GPI-0100 for Malaria Study, dated 1/22/2007.

5.    University of Hawaii: Dr. Hui MSP1 expressed in Drosophila S2, dated 3/5/07.

6.    Purdue University (Rossman), Den 80E protein for X-tal Strct., dated 9/08/05

7.    Univ. of Wisconsin, Madison – (Karassov), WN80E to study immune effect on Avian gut, dated 9/23/05

8.    Oxford University Clinical Research Unit, Hospital for Tropical Diseases, Vietnam –(Simmons), Dengue 80%E 4-serotypes for ELISPOT & ELISA, dated 10/16/05, amended 2/1/06, amended 11/21/07 and amended 3/3/08.

9.    University of Oxford (UK), Dengue Protein for research, dated 12/23/08

10.    UC Berkley, Dengue 80%E 4 serotypes for ELISPOT, date 10/10/06, amended 1/15/08, and amended 3/19/08.

11. Univ. Med Center Groningen, NL GPI-0100 for evaluation in Flu research, dated 3/6/07, amended 11/09/07 and 10/8/08

12. SUNY, Upstate Medical University, 4 serotypes of Den 80%E, dated 4/9/07.

13. Johns Hopkins Univ., GPI-0100 polypeptide vaccine testing, dated 5/1/07.

14. Florida Gulf Coast Univ., Den-2 80%E, dated 6/11/07, amended 3/19/08 and amended 4/18/08

15. Material Transfer Agreement, dated as of June 15, 2005, by and between Alcon Research, Ltd. and Avantogen, Ltd. Assigned to Avantogen, Inc.

16. Material Transfer Agreement, dated as of March 10, 2005, by and between MedImmune, Inc. and Australian Cancer Technology, assigned to Avantogen, Inc.

17. Material Transfer Agreement, dated August 22, 2001, by and between Galenica Pharmaceuticals, Inc. and Endocyte, Inc., assigned to Avantogen, Inc.

18. Material Transfer Agreement, dated September 27, 2005 by and between the South Alabama Medical Science Foundation and Avantogen, Inc.

19. USGS National Wildlife Health Center, West Nile NS1 Protein for EIA assay, dated 8/8/07, amended 8/8/08.

20. HealthBanks Biotech Co. Ltd., GPI-0100, dated 9/13/07, superseded by new agreement, dated 4/7/10.

21. La Jolla I.A.I, Dengue 80E Protein, dated 9/19/2007.

22. Univ. of Maryland Baltimore, GPI-0100, dated 2/19/08.

23. MAb Explorations Sdn Bhd, Dengue 80E, dated 5/12/08

24. Bio-Rad, Dengue-2 NS1, dated 10/23/08

25. Univ. of Queensland, Dengue-2 80E, dated 10/16/08

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed 06/08/10   Page 32 of 70

26. Chinese Univ. of Hong Kong, Malaria Recombinant Antigens, dated 12/2/08

27. Alere (fmly Inverness MIA and PANBIO Ltd), Dengue-2 NS1 Recombinant Antigen, dated 12/5/08, executed again 04/08/09 to include transfer to IMIA affiliates.

28. Alere (fmly Inverness MIA and PANBIO Ltd), JEV Recombinant Antigen, dated 12/19/08

29. Advanced Cancer Therapeutics (ACT), GPI-0100 in HPV vaccine, dated 01/15/09

30. Ocean Nanotech LLC, Malaria subunit proteins, dated 03/23/09

31. International Vaccine Institute, Dengue 80E antigen for elispot, dated 03/30/09

32. NIAID, NIH, Vaccine Research Center, West Nile 80E antigen for elispot, dated 04/10/09

33. The Duke – NUS Graduate Medical School Singapore, Den NS1 antigen and 7E11 antibody for assay development, dated 05/29/09

34. Vanderbilt University, Flavi-80E antigens for B-Cell studies, dated 06/03/09

35. Swinburne University of Technology, Den E antigen for epitope mapping, dated 11/9/09, amended 2/17/10.

36. Profectus Biosciences, Inc., GPI-0100, dated 2/25/10.

37. Biosite-IMIA (division of Alere), Dengue antigens, dated 3/23/10
38. Tulane University, Dengue antigens, dated 9/1/09.

39. Roche Palo Alto, Dengue NS1, dated 9/8/09.

40. U. N. Carolina, Dengue antigens, dated 10/29/09.

41. Harvard U., Dengue antigens, dated 11/24/09

# Exhibit C

Exhibit C

## MUTUAL CONFIDENTIALITY AGREEMENT
### Between Hawaii Biotech, Inc. and _____

**DATED:** _____ 2010

**PARTIES:**

(1)    Hawaii Biotech, Inc., a corporation located at 99-193 Aiea Heights Drive, Suite 200, Aiea, Hawaii 96701 (**"HBI"**); and

(2)    _____, a corporation located at _____ (**"Company"**).

## RECITALS

(A)    HBI is willing to disclose to Company and Company is willing to disclose to HBI certain of its respective Confidential Information (as defined below) for the Purpose (as defined below) on the terms and conditions set out in this Agreement.

(B)    In consideration of the covenants, promises and other good and valuable consideration in this Agreement, the sufficiency of which is acknowledged, it is agreed as follows.

## OPERATIVE PROVISIONS

## 1.    DEFINITIONS

1.1    In this Agreement:

**"Affiliate"** means any company or other entity which, directly or indirectly, controls, is controlled by or is under common control with a Party where "control" means the ownership of more than 50% of the issued share capital or other equity interest or the legal power to direct or cause the direction of the general management and policies of such Party, company or other entity;

**"Confidential Information"** means, in the case of HBI, all information, data and other material relating directly or indirectly to HBI's and/or its Affiliates' business, projects or products, including without limitation, any clinical, pre-clinical, laboratory, regulatory or manufacturing information and, in the case of the Company, all information, data and other material relating to the Company's and/or its Affiliates' business, projects or products, including without limitation, any clinical, pre-clinical, laboratory, regulatory or manufacturing information and in either case all other information, data and other material:

(a)    disclosed by or acquired in any way from (either directly or indirectly) the Disclosing Party or its Representatives in conjunction with this Agreement, whether in written, electronic, oral, visual or other form;

(b)    generated by way of any analysis, compilations, data studies or other documents prepared by or on behalf of the Receiving Party containing, reflecting or based in

U.S. Bankruptcy Court - Hawaii  #09-02908  Dkt # 137  Filed 06/08/10  Page 35 of 70

whole or in part on information, data or other material disclosed or acquired as described in paragraph (a) above; or

(c) regarding the existence, nature or status of any discussions between the Parties or their Representatives as contemplated by this Agreement, including the existence, nature and terms of this Agreement.

The Parties agree that no experimental materials will be transferred from one Party to another unless and until a mutually acceptable written materials transfer agreement shall have been executed by the transferring Party and the receiving Party.

Confidential Information shall **not** include any information, data and other material that:

(a) is public knowledge at the time of disclosure under this Agreement or which subsequently becomes public knowledge (other than as a result of a breach of this Agreement of other fault on the part of the Receiving Party); or

(b) can be demonstrated to have been lawfully in the possession of the Receiving Party prior to its disclosure under this Agreement or which subsequently comes into its possession from a third party (otherwise than in breach of any obligation of confidentiality either directly or indirectly).

**"Disclosing Party"** means the Party or its Representatives disclosing Confidential Information in connection with this Agreement;

**"Party"** and **"Parties"** means respectively HBI or the Company or, as the case may be, both such parties;

**"Purpose"** means the use of the Confidential Information to discuss Company's acquisition of the assets of HBI through a direct asset acquisition or through a plan of reorganization, in either case approved and confirmed by the United States Bankruptcy Court for the District of Hawaii (the **"Bankruptcy Court"**) in the case of *Hawaii Biotech, Inc.*, Case No. 09-02908 (an **"Approved Sale"**);

**"Receiving Party"** means the Party or its Representatives receiving or otherwise acquiring the Confidential Information in connection with this Agreement; and

**"Representatives"** means the Affiliates of each Party, and the directors, officers, employees, agents, representatives, attorneys and advisors of the Parties and their Affiliates.

1.2 In this Agreement, unless the context otherwise requires:
(a) references to "persons" includes individuals, bodies corporate (wherever incorporated), unincorporated associations and partnerships;

(b) the headings are inserted for convenience only and do not affect the construction of the Agreement;

(c) references to one gender includes both genders; and

(d) a "Party" includes references to that Party's successors and permitted assigns.

U.S. Bankruptcy Court - Hawaii  #09-02908  Dkt # 137  Filed  06/08/10  Page 36 of 70

## 2. USE AND NON-DISCLOSURE

2.1 Subject to the terms of this Agreement, in consideration of the disclosure of the Confidential Information by or on behalf of each of the Parties to each other, each Party undertakes:

(a) not to use the Confidential Information of the Disclosing Party nor allow it to be used by any person for any purpose other than the Purpose and to cease to use it upon written request by the Disclosing Party;

(b) to treat and maintain the Confidential Information of the Disclosing Party in strict confidence and not to directly or indirectly communicate or disclose it in any way to any other person without the express prior written consent of the Disclosing Party, except to such of it Representatives who reasonably require access to the Confidential Information for the Purpose and who are (and the Receiving Party has informed them that they are) acting under a legally binding obligation to the Receiving Party to treat the Confidential Information in the strictest confidence in accordance with the terms of this Agreement;

(c) to assume responsibility and liability for any breach of the terms of this Agreement by any of its Representatives (or action which would amount to such a breach if the same were a Party) who have or have had access to the Confidential Information of the Disclosing Party; and

(d) to take all reasonable measures and appropriate safeguards commensurate with those which it employs for the protection of its own confidential information (and to procure that all such steps are taken by its Representatives) to maintain the confidentiality of the Confidential Information of the Disclosing Party, to copy it only to the extent reasonably necessary to achieve the Purpose and not to permit unsupervised copying of the same.

2.2 No disclosure or announcement to any third party relating to the Confidential Information may be made by the Receiving Party or on its behalf except where:

2.2.1 such disclosure is, compelled by a court of law, statute, regulation or by the rules of any relevant securities exchange; and

2.2.2 the Disclosing Party has, to the extent practicable, been given sufficient prior written notice to enable it to seek confidential treatment of such Confidential Information; and

2.2.3 such disclosure is limited to the extent required.

## 3. RIGHTS TO CONFIDENTIAL INFORMATION

3.1 Each Party acknowledges that nothing in this Agreement is intended to amount to or implies any transfer, license or other grant of rights in relation to the Confidential

229393.2                                          3

Information or any patents, design right, trademark, copyright, database rights or other intellectual property rights owned or used by the other Party.

3.2     Neither Party gives any representation or warranty as to the completeness, sufficiency or accuracy of the Confidential Information disclosed by it in connection with this Agreement and accepts no liability howsoever arising from the use of its Confidential Information by the Receiving Party, save as provided in any definitive agreement which may be entered into between the Parties. Accordingly, the Disclosing Party shall not be liable for any direct, indirect or consequential loss or damage suffered by any person howsoever arising, whether in contract or tort, as a result of any use of the Confidential Information, including without limitation, the reliance upon any statement contained in or omitted from the Confidential Information.

3.3     Nothing is this Agreement shall be, or be construed as being, an agreement between the Parties or any of their respective Representatives to enter into any arrangement or further agreement relating to the subject matter of this Agreement, any such arrangement or agreement being the subject of separate negotiations. However, for the avoidance of doubt, this Agreement shall continue to cover the disclosure and use of Confidential Information during such negotiations unless and until a definitive agreement is executed.

3.4     The Company understands that (i) HBI and its Representatives shall be free to conduct any process for any transaction involving HBI or its assets as may be approved by the Bankruptcy Court, as determined by HBI in its discretion (including, without limitation, negotiating with any other interested parties and entering into a definitive agreement with any such parties without prior notice to the Company or any other person), (ii) any procedures relating to such process or transaction may be changed at any time, and (iii) the Company shall not have any claims whatsoever against HBI, its Representatives, or any third party with whom a transaction is entered into.

3.5     Each Party acknowledges and agrees that all Confidential Information received by it, and any copies of the Confidential Information, shall be and remain the exclusive property of the Disclosing Party. The Receiving Party shall, or shall procure, on the written request and at the option of the Disclosing Party, either the destruction or return of the Confidential Information, without retaining any copies, extracts or other reproductions, in whole or in part, other than a single archival copy of the Confidential Information, to be retained in its legal department solely for the purpose of ensuring compliance with the terms of this Agreement. Except for the retention of such single archival copy, on the written request of the Disclosing Party, Confidential Information comprising analyses, complications, data studies or other documents prepared by the Receiving Party containing or based in whole or in part on the Disclosing Party's Confidential Information or reflecting the Receiving Party's views of such Confidential Information shall be destroyed by the Receiving Party. Upon request, such return or destruction shall be certified in writing to the Disclosing Party by the authorized officer of the Receiving Party supervising the return or destruction.

3.6     To the extent that any Confidential Material may include materials subject to the attorney-client privilege, work product doctrine or any other applicable privilege concerning pending or threatened legal proceedings or governmental investigations, each Party understands and agrees that there is a commonality of interest with respect to such matters and it is the desire, intention and mutual understanding of HBI and the Company that the sharing of such material is not intended to, and shall not, waive or diminish in

229393.2                                          4

any way the confidentiality of such material or its continued protection under the attorney-client privilege, work product doctrine or other applicable privilege. All Confidential Material provided by either Party that is entitled to protection under the attorney-client privilege, work product doctrine or other applicable privilege shall remain entitled to such protection under these privileges, this Agreement, and under the joint defense doctrine.

**4.    REMEDIES**

Due to the proprietary nature of the Confidential Information, the Parties understand and agree that the Disclosing Party may suffer irreparable harm in the event that the Receiving Party fails to comply with any of the obligations contained under this Agreement and that monetary damages alone may not be an adequate remedy for such breach. Accordingly, the Parties agree that the Disclosing Party shall be entitled to seek the remedies of injunction, specific performance and other equity relief for any threatened or actual breach of the obligations contained in this Agreement.

**5.    DURATION**

The term of this Agreement shall be for a period of 5 years from the date of this Agreement.

**6.    OTHER PROVISIONS**

6.1    Any variation to this Agreement must be in writing and signed by a properly authorized representative of each Party.

6.2    Neither party shall, during the term of this Agreement and for a period of 12 months immediately following the expiration or termination of the Agreement, whether on its own behalf or in conjunction with or on behalf of any person, firm, company, business entity or other organization and whether as employee, director, principal, agent, consultant, shareholder or in any other capacity whatsoever, directly or indirectly induce, solicit, entice or procure any person who is or was an employee, agent and/or representative of the other party to cease working for such other party or accept into employment or otherwise engage or use the services of any person where that person is an employee, agent and/or representative of such other party at that time.

6.3    This Agreement may not be assigned by either Party without the prior written consent of the other Party; provided, however, that HBI may assign this Agreement without the consent of the Company in connection with an Approved Sale, and the assignee in such Approved Sale shall have all of the rights granted to HBI hereunder, including, without limitation, the right to enforce against the Company, its Representatives, and their respective successors and assigns all of the rights, benefits, and privileges possessed by HBI in this Agreement as if such assignee were originally a party hereto.

6.4    Any delay or failure by either Party in exercising any right power or privilege under this Agreement shall not constitute a waiver of such right, power or privilege nor shall any single or partial exercise preclude any future exercise.

6.5    If any term of provision of this Agreement is held by any court or other competent authority to be void or unenforceable, in whole or in part, the other provisions of this

U.S. Bankruptcy Court - Hawaii  #09-02908  Dkt # 137  Filed 06/08/10  Page 39 of 70

Agreement and the remainder of the affected provision shall continue to be valid and remain enforceable to the fullest extent permitted by law.

6.6    A person who is not a party to this Agreement other than an Affiliate shall have no right to enforce any of its terms. Notwithstanding the foregoing, this Agreement may be varied or terminated by agreement in writing between the parties or this Agreement may be rescinded (in each case), without the consent of any such Affiliates.

6.7    This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of the Agreement, and all of which, when taken together, shall be deemed to constitute one and the same Agreement. Signatures to this Agreement by fax, by electronic mail in "portable document format" (".pdf"), or by any other electronic means intended to preserve the original graphic and pictorial appearance of the Agreement, shall have the same effect as physical delivery of the paper document bearing the original signature.

6.8    This Agreement and the obligation of the Parties shall be governed by and construed in accordance with the laws of the State of Hawaii, without regard to its conflict of law provisions and the Parties subject themselves to the jurisdiction of the courts of the State of Hawaii.


Signed for and on behalf of
**Hawaii Biotech, Inc.**

Signed for and on behalf of
_____


_____
**Signature**

_____
**Signature**


_____
**Print Name**

_____
**Print Name**


_____
**Title**

_____
**Title**

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed  06/08/10   Page 40 of 70

# Exhibit D

# Exhibit D

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

HAWAII BIOTECH, INC.

AND

HBI ACQUISITION CORP.

DATED AS OF JUNE ___, 2010

1180005 v5/SF

SCHEDULES

| | |
|---|---|
| Schedule 2.1(b) | Accounts Receivable |
| Schedule 2.1(c) | Inventory |
| Schedule 2.1(e) | Assumed Agreements |
| Schedule 2.1(f) | Purchased IP |
| Schedule 2.2 | Excluded Assets |
| Schedule 2.3 | Assumed Liabilities |
| Schedule 2.5(a) | Cure Payment Estimates |
| Schedule 5.3 | No Violation |
| Schedule 5.4 | Title to Assets |
| Schedule 5.5 | Contracts |
| Schedule 5.6 | Legal Proceedings |
| Schedule 5.9 | Compliance With Law |
| Schedule 7.1 | Exceptions to Covenants |
| Schedule 7.1(b) | Interim Compensation |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Assumption Agreement |
| Exhibit B | Form of Bill of Sale and Assignment Agreement |
| Exhibit C | Form of Sale Order |
| Exhibit D | Bid Procedures |

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed   06/08/10   Page 43 of 70

1180005 v5/SF

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made and entered into as of this ___ day of June, 2010 by and between Hawaii Biotech, Inc., a Delaware corporation (the "Seller"), and HBI Acquisition Corp., a Delaware corporation (the "Buyer").

WHEREAS, the Seller is presently the debtor-in-possession in a pending Chapter 11 bankruptcy case filed pursuant to Title 11 of the United States Code, 11 U.S.C. § 101, et seq. in the United States Bankruptcy Court for the District of Hawaii, case number 09-02908 (the "Bankruptcy Case"); and

WHEREAS, the Buyer desires to purchase from the Seller, and the Seller desires to sell to the Buyer, certain of the Seller's assets free and clear of Encumbrances (as defined below) except for Permitted Encumbrances (as defined below), and to assume from the Seller certain specified liabilities pursuant to the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1 (a) Definitions. As used in this Agreement, the following terms have the meanings specified in this Section 1.1(a).

"Accounts Receivable" means any and all accounts receivable and other amounts receivable owed to the Seller, together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Assumed Agreements" means the Contracts listed on Schedule 2.1(e); provided, however, that from and after the date hereof until the Closing, the Buyer may, in its sole discretion, designate any Contract of Seller as an Assumed Agreement or remove such Contract from Schedule 2.1(e) such that it is not an Assumed Agreement, in each case by providing written notice of such designation or removal to the Seller, in which case Schedule 2.1(e) shall be deemed to be amended to include or remove, as applicable, such Contract as an Assumed Agreement.

"Assumption Agreement" means the Assumption Agreement to be executed and delivered by the Buyer and the Seller at the Closing, substantially in the form of Exhibit A.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Hawaii or such other court having competent jurisdiction over the Chapter 11 Case.

"Bidding Procedures Order" means the order of the Bankruptcy Court, in a form reasonably acceptable to the Buyer, which includes, among other things: (i) the Expense Reimbursement and all other payments to the Buyer arising under this Agreement as obligations of the Seller having super-priority, senior to all other administrative expense claims of the Seller, as administrative expenses under

sections 503 and 507(b) of the Bankruptcy Code in the Chapter 11 Case, to be paid to the Buyer, in cash, from the sale proceeds generated by the sale or sales of the Purchased Assets upon and in connection with a Third-Party Sale; (ii) the Buyer's designation as the stalking horse bidder together with the provisions of this Agreement to be performed by the Seller before the Closing; (iii) a deadline for the filing of objections to the entry of the Sale Order and the assumption by the Seller and assignment to the Buyer of Assumed Agreements; (iv) a schedule for the Auction in accordance with the terms of this Agreement; (v) a schedule for the Sale Hearing in accordance with the terms of this Agreement; (vi) implementation of the bidding procedures attached as Exhibit D; and (vii) provisions implementing Sections 7.9 and 7.10.

"Bill of Sale" means the Bill of Sale and Assignment Agreement to be executed and delivered by the Seller to the Buyer at the Closing, substantially in the form of Exhibit B.

"Business" means the business conducted by the Seller.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by law to be closed in Honolulu, Hawaii.

"Buyer's Representatives" means the Buyer's accountants, officers, employees, counsel, financial advisors and other authorized representatives.

"Chapter 11 Case" means the Bankruptcy Case.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the Confidentiality Agreement by and between the Buyer and the Seller, dated June __, 2010, as amended from time to time.

"Consent" means any approval, consent, ratification, permission, waiver or authorization, or an order of the Bankruptcy Court that deems, or renders unnecessary, the same.

"Contract" means any lease, contract, deed, mortgage, license or other legally enforceable agreement or instrument.

"Copyrights" means copyrights, whether registered or unregistered (including copyrights in computer software programs), mask work rights, works of authorship and moral rights, and all registrations, applications and renewals therefor.

"Employees" means all employees of the Seller, including those on disability or leave of absence, paid or unpaid.

"Encumbrances" means any charge, lien (statutory or otherwise), mortgage, lease, hypothecation, encumbrance, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment, Claim, conditional or installment sale agreement, use or transfer limitation, equitable interest or similar restriction; *provided, however*, that Assumed Liabilities shall not constitute Encumbrances.

"FDA" means the United States Food and Drug Administration, or any successor agency thereto.

"FDA Act" means the United States Federal Food, Drug, and Cosmetic Act, as amended, and regulations promulgated thereunder.

"Final Order" means an order of the Bankruptcy Court as to which the time to file an appeal, a motion for rehearing or reconsideration, or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Governmental Authority" means any federal, municipal, state, local or foreign governmental, administrative or regulatory authority, department, agency, commission or body (including any court or similar tribunal).

"Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

"Intellectual Property" means all worldwide regulatory filings, including without limitation any Investigational New Drug filings and associated Drug Master Files, all regulatory correspondence and minutes with FDA and others, each summary of clinical data generated to date (clinical listing), all Clinical Trial Reports, all data listings and tables, all manufacturing standard operating procedures and batch records, all product stability data, all manufacturing development reports and notebooks, all manufacturing process and formulation, including trade secrets, all validated product release specifications and records, all recombinant proteins (including all associated with West Nile, dengue, and all other vaccines), all characterization specifications, all quality control and assurance reports and records, all bioassay development reports, all toxicology data packages, all pharmacology data packages, all model data, all preclinical reports and notebooks, all preclincal reports to support mechanism of action, all structure activity relationship data and reports, all material transfer agreements and reports, all methods transfer agreements and reports databases, all data collections, diagrams, inventions (whether or not patentable), know-how, logos, marks (including brand names, product names, logos, and slogans), methods, processes, proprietary information, protocols, specifications, software, software code (in any form, including source code and executable or object code), techniques, URLs (including www.hibiotech.com), web sites, works of authorship and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing, such as instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries).

"Intellectual Property Rights" means all of the rights arising from or in respect of the following, whether protected, created or arising under the Laws of the United States or any foreign jurisdiction: (A) Patents; (B) Trademarks; (C) Copyrights; (D) confidential and proprietary information, or non-public processes, designs, specifications, technology, know-how, techniques, formulas, invention disclosures, inventions (whether or not patentable and whether or not reduced to practice), concepts, trade secrets, discoveries, ideas, research and development, compositions, manufacturing and production processes, technical data and information, customer lists, supplier lists, pricing and cost information, and business and marketing plans and proposals, in each case, under this clause (D), excluding any rights in respect of any of the foregoing that comprise or are protected by Patents; (E) all applications, registrations and permits related to any of the foregoing clauses (A) through (D); and (F) any and all rights to institute any Legal Proceedings for past, present, or future infringement, misappropriation or other violation of any of the foregoing.

"Inventory" means all inventory (including all recombinant protein, vaccine, drug supply, material on stability, raw materials, products in-process, and finished products) of the Seller.

"Knowledge" means, as to a particular matter, the actual knowledge of: (i) with respect to the Buyer, its chief executive officer, and (ii) with respect to the Seller, any of the following individuals: D. Elliott Parks, Richard Sherman, Beth-Ann Coller, Ph.D. or David E. Clements.

"Legal Requirement" means any federal, state, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree,

proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, requirement, specification, determination, decision, opinion or interpretation issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"Liability" means any debt, obligation or liability of any nature (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such debt, obligation or liability would be required to be disclosed on a balance sheet prepared in accordance with generally accepted accounting principles and regardless of whether such debt, obligation or liability is immediately due and payable.

"Licensed Intellectual Property" means all Intellectual Property and Intellectual Property Rights licensed to the Seller pursuant to the Assumed Agreements.

"Material Adverse Effect" means any event, condition, circumstance, development or effect that, individually or in the aggregate with all other events, changes, conditions, circumstances, developments and effects, has had or would reasonably be expected to have or to result in a material adverse effect on: (i) the Purchased Assets, taken as a whole; (ii) the Assumed Liabilities, taken as a whole; or (iii) the ability of the Seller to perform its material obligations under this Agreement.

"Patents" means all U.S. and foreign patents, patent applications, any reissues, reexaminations, divisionals, provisionals, substitutions, renewals, continuations, continuations-in-part and extensions thereof.

"Permitted Encumbrances" means: (a) statutory liens for current Taxes, special assessments or other governmental charges not yet due and payable; (b) mechanics', materialmens', carriers', workers', repairers' and similar statutory liens arising or incurred in the ordinary course of business which liens are not reasonably likely to materially interfere with the use or value of the Purchased Assets as a whole; (c) statutory liens creating a security interest in favor of landlords under leases which do not interfere with the Seller's current use of, or affect the value of, any Purchased Asset; (d) Encumbrances on any of the Purchased Assets which do not interfere with the Seller's current use of, or affect the value of, any Purchased Asset; (e) Encumbrances contained in the Assumed Agreements; and (f) Encumbrances arising from applicable laws of general application which do not interfere with the Seller's current use of, or affect the value of, any Purchased Asset.

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, group, trust, association or other organization or entity or government, political subdivision, agency or instrumentality of a government.

"Petition Date" means December 11, 2009.

"Post-Petition Loan" means the debtor in possession loan advanced to the Seller pursuant to that certain Amended and Restated Postpetition Loan and Security Agreement dated as of December 31, 2009, in the outstanding principal amount of $1,455,312 or such greater amount as may have been advanced thereunder, from the Lenders referenced therein.

"Purchased Assets" means the assets to be acquired by the Buyer as described in Section 2.1.

"Purchased IP" means all Intellectual Property and Intellectual Property Rights (including the goodwill of the Seller) owned by the Seller as of the Closing (including the right to use the name Hawaii Biotech, Inc. and other trade names included in the Purchased Assets and including the Intellectual Property listed on Schedule 2.1(f)), and all right, title and interest of the Seller in the Licensed Intellectual Property.

"Registered IP" means all Specified IP that, as of the date of this Agreement, is registered, filed or issued under the authority of, with or by any Governmental Authority in the United States of America, including all Patents, registered Copyrights, registered mask works and registered Trademarks and all applications for any of the foregoing.

"Sale Hearing" means the hearing at which the Bankruptcy Court considers approval of the Sale Order.

"Sale Motion" means one or more motions and notices filed by the Seller and served on creditors and parties in interest, in accordance with the Bidding Procedures Order, other orders of the Bankruptcy Court, the Federal Rules of Bankruptcy Procedures and Local Rules, which motion(s) seeks authority from the Bankruptcy Court for the Seller to enter into this Agreement and consummate the transaction contemplated by this Agreement.

"Seller's Representatives" means the accountants, officers, employees, counsel, financial advisors and other authorized representatives of the Seller.

"Tax" means any tax (including any income tax, franchise tax, service tax, capital gains tax, gross receipts tax, value-added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, business tax, withholding tax or payroll tax), levy, assessment, tariff, duty (including any customs duty), deficiency or fee (including any fine, addition, penalty or interest), imposed, assessed or collected by or under the authority of any Governmental Authority or any Liability with respect to the foregoing by virtue of any Contract or otherwise.

"Tax Return" means any return, report, information return or other document (including any related or supporting information) required to be supplied to any Governmental Authority with respect to Taxes.

"Trademarks" means registered or unregistered trademarks, service marks, trade dress rights, trade names, Internet domain names, identifying symbols, logos, emblems, signs or insignia, and including all goodwill associated with the foregoing, and all registrations, applications and renewals therefor.

"Transaction Documents" means this Agreement, the Assumption Agreement, the Bill of Sale and Assignment Agreement and any other Contract to be entered into by the parties hereto in connection with the Closing.

"Transfer Taxes" means any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp or other Taxes (excluding any income or capital gains Taxes) and recording charges (including penalties and interest) payable in respect of (and as a result of) the sale of the Purchased Assets to, and the assumption of the Assumed Liabilities by, the Buyer.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (1988) and any similar Legal Requirement under the laws of any state that is applicable to a termination of employees, including, to the extent applicable, the Hawaii Dislocated Workers Law.

(b)    Each of the terms set forth below shall have the meaning ascribed thereto in the following Section:

| Definition | Location |
|---|---|
| "Agreement" | Preamble |
| "Allocation" | § 7.7 |
| "Assumed Liabilities" | § 2.3 |
| "Auction" | § 7.9 |

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed  06/08/10   Page 48 of 70

| | |
|---|---|
| "Buyer" | Preamble |
| "Closing" | § 4.1 |
| "Closing Date" | § 4.1 |
| "Contract Notice Period" | § 2.5(c) |
| "Cure Payments" | § 2.5(e) |
| "Deposit" | § 3.2 |
| "Documentary Materials" | § 2.1(h) |
| "Excluded Agreements" | § 2.2 |
| "Excluded Assets" | § 2.2 |
| "Excluded Liabilities" | § 2.4 |
| "Expense Reimbursement" | § 7.10 |
| "Motions" | § 7.8(a) |
| "Proceeding" | § 5.5 |
| "Professional Services" | § 2.4 |
| "Purchase Price" | § 3.1 |
| "Regulatory Approvals" | § 7.5(a) |
| "Sale Order" | § 7.8(a) |
| "Seller" | Preamble |
| "Third-Party" | § 7.10 |
| "Third-Party Sale" | § 7.10 |

Section 1.2    Construction.  The terms "hereby," "hereto," "hereunder" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used.  The term "including," when used herein without the qualifier, "without limitation," shall mean "including, without limitation."  Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.  The word "or" shall not be construed to be exclusive.  Provisions shall apply, when appropriate, to successive events and transactions.  Unless otherwise indicated, references to Articles, Sections, Schedules and Exhibits refer to Articles, Sections, Schedules and Exhibits of and to this Agreement.

**ARTICLE II**
**PURCHASE AND SALE**

Section 2.1    Purchase and Sale of Assets.  Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, the Seller shall sell, assign, convey, transfer and deliver to the Buyer, and the Buyer shall, by the Buyer's payment of the Purchase Price, purchase and acquire from the Seller, all of the Seller's right, title and interest, free and clear of all Encumbrances (other than Permitted Encumbrances), in and to all of the properties, rights, interests and other tangible and intangible assets of the Seller (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with generally accepted accounting principles), including any assets acquired by the Seller after the date hereof but prior to the Closing; *provided, however*, that: (A) the Purchased Assets shall not include any of the Excluded Assets; and (B) from and after the date hereof until Closing, the Buyer may designate, in its sole discretion, any asset or assets that would otherwise be Purchased Assets as Excluded Assets by providing written notice of such designation to the Seller, in which case Schedule 2.2 shall be deemed to be amended accordingly.  Without limiting the generality of the foregoing, the Purchased Assets shall include the following (except to the extent listed or otherwise included as an Excluded Asset):

(a)  all cash and cash equivalents as of the Closing;

(b)  all Accounts Receivable of the Seller as of the Closing, and other amounts receivable by the Seller as of the Closing (under the Assumed Agreements or otherwise), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon;

(c)  all Inventory, supplies, materials and spare parts of the Seller as of the Closing;

(d)  without duplication of the above, all royalties, advances, prepaid assets, security and other deposits, prepayments, Tax receivables, Tax refunds and other current assets relating to the Business, as of the Closing;

(e)  all Assumed Agreements;

(f)  all Purchased IP;

(g)  all items of machinery, equipment, supplies, furniture, fixtures, leasehold improvements and other tangible personal property owned by the Seller as of the Closing;

(h)  all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, all supporting documents for regulatory filings, operating data and plans, technical documentation (lab notebooks, manufacturing instructions and processes, design specifications, blueprints, records of experiments, electronic copies of patent applications as filed, functional requirements, operating instructions, logic manuals, flow charts, and similar items), user documentation (installation guides, user manuals, process manuals, training materials, release notes, working papers, etc.), marketing documentation, advertising and promotional materials (including sales brochures, flyers, pamphlets, web pages, and the like), and other similar materials related to the Purchased Assets, in each case whether or not in electronic form, and without regard to the media used, and similar items of the Seller as of the Closing (except as otherwise expressly described in Section 2.2) (collectively, the "Documentary Materials");

(i)  all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with current and former Employees and agents of the Seller or with third parties relating to the Purchased Assets (or any portion thereof), including all non-disclosure agreements executed by parties to which Seller has made available information, whether or not such agreements are included as Assumed Agreements;

(j)  all preference or avoidance claims and actions of the Seller against Buyer or any of its officers, directors, shareholders, or Affiliates, including any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code;

(k)  all rights of the Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers or contractors, pertaining to any Purchased Assets;

(l)  any documents or other materials that are subject to attorney-client or other privilege, or to the attorney work product protection, to the extent that they relate to any of the Purchased Assets, including all Patent, Copyright, and Trademark prosecution files and materials prepared or held by attorneys representing the Seller on such matters;

(m)  all of the Seller's interests in PanThera Biopharma LLC; and

(n)  all claims (including claims for past infringement or misappropriation of Purchased IP) and causes of action (other than, in each case, to the extent directly related to Excluded Assets

or Excluded Liabilities) of the Seller as of the Closing against Persons other than the Seller (regardless of whether or not such claims and causes of action have been asserted by the Seller), and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by the Seller as of the Closing (regardless of whether such rights are currently exercisable) to the extent related to the Purchased Assets.

Section 2.2    Excluded Assets.   Notwithstanding any provision herein to the contrary, the Purchased Assets shall not include the following (collectively, the "Excluded Assets"):

(a)   any records, documents or other information relating to current or former Employees of any of the Seller that will not be employed by the Buyer immediately after the Closing, and any materials containing information about Employees, disclosure of which would violate an Employee's reasonable expectation of privacy;

(b)   the Seller's minute books and other corporate books and records relating to their organization and existence and the Seller's books and records relating to Taxes of the Seller;

(c)   all preference or avoidance claims and actions of the Seller, including any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code, or those set forth in Section 2.1(j);

(d)   the Seller's rights under this Agreement and the other Transaction Documents;

(e)   any Contracts other than the Assumed Agreements (the "Excluded Agreements");

(f)   all claims and causes of action of the Seller as of the Closing against Persons other than the Buyer (regardless of whether or not such claims and causes of action have been asserted by the Seller), and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, of the Seller (regardless of whether such rights are currently exercisable), in each case to the extent directly related to: (1) any Excluded Assets or Excluded Liabilities; or (2) any item of tangible or intangible property not acquired by the Buyer at the Closing;

(g)   all rights under director and officer (or similar) insurance policies maintained by the Seller;

(h)   any documents or other materials which are subject to attorney-client or other privilege, except those set forth in Section 2.1(l); and

(i)   the Seller's right, title and interest to the other assets, if any, set forth in Schedule 2.2 (collectively, the "Excluded Assets").

Section 2.3    Assumed Liabilities.   On the Closing Date, the Buyer shall execute and deliver to the Seller the Assumption Agreement pursuant to which the Buyer shall assume and agree to pay, perform and discharge when due the Assumed Liabilities. For purposes of this Agreement, "Assumed Liabilities" means only the following Liabilities (to the extent not paid prior to the Closing):

(a)   the obligations of the Seller under the Assumed Agreements to the extent such obligations: (i) arise after the Closing; (ii) do not arise from or relate to any breach by the Seller of any provision of any of such Assumed Agreements; (iii) do not arise from or relate to any event, circumstance or condition occurring or existing on or prior to the Closing Date that, with notice or lapse of time, would constitute or result in a breach of any of such Assumed Agreements; and (iv) are ascertainable (in nature and amount) solely by reference to the express terms of such Assumed Agreements;

(b)   the liabilities to be assumed by the Buyer pursuant to Section 7.6; and

(c)   all Cure Payments.

Section 2.4    Excluded Liabilities.  The Buyer shall not assume or be obligated to pay, perform or otherwise discharge any Liabilities of the Seller other than the Assumed Liabilities (collectively the "Excluded Liabilities").  The Excluded Liabilities include the following, whether incurred or accrued before or after the Petition Date or the Closing:

(a)   all Taxes of the Seller;

(b)   all Liabilities of the Seller relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services ("Professional Services") performed in connection with this Agreement and any of the transactions contemplated hereby, and any pre-petition or post-petition Claims for such Professional Services;

(c)   all Liabilities with respect to current and former Employees of the Seller (including Liabilities under or relating to any of the Seller's employee benefit plans);

(d)   all Liabilities relating to Excluded Assets;

(e)   all expenses of administration of the Bankruptcy Case;

(f)   all accounts payable (or other amounts payable); and

(g)   any other Liability that is not expressly included among the Assumed Liabilities.

Section 2.5    Assumption and Assignment of Certain Contracts.  The Sale Order shall provide for the assumption by the Seller (to the extent not already assumed by prior order of the Bankruptcy Court entered in the Bankruptcy Case), and the Sale Order shall, to the extent permitted by law, provide for the assignment by the Seller to the Buyer, effective upon the Closing, of the Assumed Agreements on the terms and conditions set forth in the remainder of this Section 2.5.

(a)   At the Closing, the Seller shall assume (to the extent not already assumed by prior order of the Bankruptcy Court entered in the Bankruptcy Case), and assign to the Buyer the Assumed Agreements.  The Seller shall identify the Assumed Agreements with reference to the effective date of each Assumed Agreement (if available), the parties to each Assumed Agreement, and the addresses (if available) of the non-debtor parties.  Schedule 2.5(a) sets forth the Seller's good-faith estimate as of the date of this Agreement of the amounts necessary to cure defaults, if any, under each of the Assumed Agreements set forth on Schedule 2.1(e), as determined by the Seller based on the Seller's books and records and good faith judgment.  The Seller shall provide an update of such good faith estimate not less than three Business Days prior to the Closing Date.

(b)   In the case of any amendment by the Buyer of Schedule 2.1(e), the Seller shall give notice to the other parties to any Contract to which such amendment relates of the removal or addition of such Contract from Schedule 2.1(e) within three Business Days of the Buyer notifying the Seller of such amendment or such lesser time as is approved by the Bankruptcy Court.

(c)   At any time before or after Closing and prior to the liquidation and dissolution of the Seller, subject to providing the Buyer with not less than five Business Days prior written notice ("Contract Notice Period"), the Seller may move to reject any Contract which is not an Assumed Agreement; provided, however, the Buyer may, at any time during the Contract Notice Period, add such Contract to Schedule 2.1(e) and require the Seller not to reject such Contract.

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed 06/08/10   Page 52 of 70

(d)　　　As part of the Motions (or, as necessary in one or more separate motions), the Seller shall request that by virtue of the Seller providing notice of its intent to assume and assign or, as applicable, to assign any Contract, and in the absence of any objection by the non-debtor party to such Contract, the Bankruptcy Court deem such non-debtor party to have given any required Consent to the assumption of the Contract by the Seller and assignment to the Buyer and, pursuant to the Sale Order or other Bankruptcy Court Order, the Seller be authorized to assume and assign the Contract to the Buyer and the Buyer be authorized to accept such Assumed Agreement pursuant to section 365 of the Bankruptcy Code.

(e)　　　To the extent that any Assumed Agreement is subject to a cure pursuant to section 365 of the Bankruptcy Code, the Buyer shall be responsible for such cure and to pay any amounts related to such cure obligations as determined by the Bankruptcy Court or as agreed to by the Buyer and the non-debtor party to each such Assumed Agreement (the "Cure Payments").

(f)　　　The Seller shall use its commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assumed Agreements to the Buyer.  In the event the Seller is unable to assign any such Assumed Agreement to the Buyer pursuant to an order of the Bankruptcy Court, the Buyer and the Seller shall use commercially reasonable efforts prior to the Closing to obtain, and to cooperate in obtaining, all Consents and Governmental Authorizations from Governmental Authorities and third parties necessary to assume and assign such Assumed Agreement to the Buyer; *provided, however*, that, other than the payment of Cure Payments as contemplated by Section 2.5(e), neither the Seller nor the Buyer shall be required to pay or commit to pay any amount to (or incur any material obligation in favor of) any Person from whom any such Consent or Governmental Authorization may be required.

Section 2.6　　　Post-Closing Assignment of Contracts.

(a)　　　With respect to any Contract which is not set forth on Schedule 2.1(e) (as amended from time to time as contemplated in the definition of "Assumed Agreements") as of the Closing, provided such Contract has not been rejected by the Seller pursuant to section 365 of the Bankruptcy Code, following the Closing and until the dissolution and liquidation or reorganization of the Seller, upon written notice(s) from the Buyer, the Seller shall, at the Buyer's sole cost and expense, including with respect to Cure Payments, use commercially reasonably efforts to assume and assign to the Buyer pursuant to section 365 of the Bankruptcy Code as soon as practicable any Contract(s) set forth in the Buyer's notice(s), and any Cure Payments applicable thereto shall be borne by the Buyer.

(b)　　　Notwithstanding anything in this Agreement to the contrary, on the date any Contract is assumed and assigned to the Buyer pursuant to this Section 2.6, such Contract shall be deemed an Assumed Agreement and deemed scheduled on Schedule 2.1(e) for all purposes under this Agreement.

# ARTICLE III
# PURCHASE PRICE

Section 3.1　　　Purchase Price.  In consideration for the transfer of the Purchased Assets to Buyer, subject to the terms and conditions of this Agreement, and the entry and effectiveness of the Sale Order, the purchase price for the Purchased Assets shall be: (i) One-Million Four Hundred Forty-Five Thousand Three Hundred Twelve Dollars ($1,445,312), to be satisfied solely in the form of a credit against, and the extinguishment of, the amount of the Seller's outstanding debt under the Post-Petition Loan pursuant to Section 363(k) of the Bankruptcy Code or otherwise; plus (ii) assumption of the Assumed Liabilities at Closing, plus (iii) payment of the Cure Amounts at or following the Closing (collectively, "Purchase Price").

# ARTICLE IV
# THE CLOSING

Section 4.1    Time and Place of the Closing.  Upon the terms and subject to the satisfaction of the conditions contained in Article VIII of this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement (the "Closing") shall take place at the offices of McCorriston Miller Mukai MacKinnon LLP, Five Waterfront Plaza, 4th Floor, 500 Ala Moana Boulevard, Honolulu, Hawaii at 10:00 A.M. (local time) not later than the second Business Day following the date on which the conditions set forth in Article VIII have been satisfied (other than the conditions with respect to actions the respective parties hereto will take at the Closing itself) or, to the extent permitted, waived by the applicable party in writing, or at such other place and time as the Buyer and the Seller may mutually agree.  The date and time at which the Closing actually occurs is herein referred to as the "Closing Date."

Section 4.2    Deliveries by the Seller.  At or prior to the Closing, the Seller shall deliver the following to the Buyer:

(a)    the Bill of Sale, duly executed by the Seller, recordable assignment agreements with respect to Purchased IP (including, in the Buyer's sole discretion, a patent assignment agreement and a trademark assignment agreement), and all such other instruments of assignment or conveyance as shall be reasonably necessary to transfer to the Buyer good and valid title, free and clear of all Encumbrances (other than Permitted Encumbrances), to all of the Purchased Assets in accordance with this Agreement;

(b)    the certificate contemplated by Section 8.2(c);

(c)    the Assumption Agreement, duly executed by the Seller;

(d)    a copy of the Sale Order as entered by the Bankruptcy Court;

(e)    a revised Schedule 2.5(a) setting forth the estimated Cure Payments as of the Closing;

(f)    any certificates or other documents reflecting all membership or partnership interests of the Seller in PanThera Biopharma LLC; and

(g)    letters of direction addressed to applicable past and current counsel to the Seller, in a form reasonably acceptable to the Buyer and duly executed by the Seller, authorizing the Buyer to obtain access to the documents and material set forth in Section 2.1(l).

Section 4.3    Deliveries by the Buyer.  At or prior to the Closing, the Buyer shall deliver the following to the Seller:

(a)    the original of all promissory notes reflecting the Post-Petition Loan, each marked "Paid in Full" in accordance with Section 3.1;

(b)    the Assumption Agreement, duly executed by the Buyer; and

(c)    the certificate contemplated by Section 8.3(b).

1180005 v5/SF

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Buyer that:

Section 5.1    <u>Organization and Good Standing</u>.  The Seller is duly organized, validly existing and in good standing under the laws of the State of Delaware.

Section 5.2    <u>Authority Relative to this Agreement</u>.  Subject to the applicable provisions of the Sale Order, the Seller has all corporate or other authority necessary to execute and deliver this Agreement and the other Transaction Documents to which it is a party and, upon entry and effectiveness of the Sale Order, will have all corporate or other authority necessary to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the other Transaction Documents to which the Seller is party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by the board of directors (or equivalent) of the Seller, and no other corporate or other proceedings on the part of the Seller is necessary to authorize this Agreement or the other Transaction Documents to which it is party or to consummate the transactions contemplated hereby or thereby.  This Agreement and the other Transaction Documents to which the Seller is a party has been duly and validly executed and delivered to the Seller, and assuming that this Agreement and the other Transaction Documents to which it is party constitute valid and binding agreements of the Buyer, and subject to the entry and effectiveness of the Sale Order, constitute valid and binding agreements of the Seller, enforceable against the Seller in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

Section 5.3    <u>No Violation</u>.  Except as described on <u>Schedule 5.3</u>, neither the execution and delivery of this Agreement nor the sale by the Seller conflicts with or results in any breach of any provision of the Seller's Certificate of Incorporation or Bylaws (or similar organizational documents).

Section 5.4    <u>Title to Assets; Intellectual Property</u>.

(a)  Except as set forth in <u>Schedule 5.4</u>, the Seller has good and valid title to, or, with respect to equipment leases, a valid leasehold interest in, the Purchased Assets, in each case free and clear of all Encumbrances (other than Permitted Encumbrances and other than Encumbrances which shall be terminated in the Bankruptcy Case).

(b)  <u>Schedule 2.1(f)</u> identifies as of the date hereof: (i) each item of Registered IP in which the Seller has or purports to have an ownership interest of any nature (whether exclusively, jointly with another Person or otherwise); (ii) the jurisdiction in which such item of Registered IP has been registered or filed and the applicable registration or serial number; and (iii) any other Person that has an ownership interest in such item of Registered IP and the nature of such ownership interest.

(c)  The Seller has taken commercially reasonable steps to maintain the confidentiality of all proprietary information held by it or purported to be held by it as a trade secret, except as would not reasonably be expected to result in a Material Adverse Effect.

(d)  To the Knowledge of the Seller, except as set forth in <u>Schedule 2.1(f)</u>, the Purchased IP is valid, subsisting and enforceable.

(e)  <u>Schedule 2.1(f)</u> lists, as of the date hereof, each Contract pursuant to which: (i) the Seller licenses any Intellectual Property or Intellectual Property Right from any Person (other than licenses of non-customized software that are generally available to the public on standard terms); and (ii) any Person has been granted any license under, or otherwise has received or acquired any right (whether

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed  06/08/10   Page 55 of 70
12

or not currently exercisable) or interest in, any Purchased IP, other than Contracts entered into with customers of the Seller in the ordinary course of business.

        (f) Except as set forth on Schedule 2.1(f), to the Knowledge of the Seller, no Person has infringed, misappropriated or otherwise violated, and no Person is infringing, misappropriating or otherwise violating, any Purchased IP. Except as described on Schedule 2.1(f), to the Knowledge of the Seller: (i) Seller's products have not infringed (directly, contributorily, by inducement or otherwise) any Intellectual Property Right of any other Person, and (ii) the Seller has not misappropriated or otherwise violated any Intellectual Property Right of any other Person.

        Section 5.5    Contracts. To the Knowledge of the Seller, each material Contract to which the Seller is a party or is bound is valid and in full force and effect in accordance with its terms. Except as may be cured in the Bankruptcy Case or as set forth in Schedule 5.5, the Seller is not in breach in any material respect of any Assumed Agreement or any material Contract to which the Seller is a party or is bound.

        Section 5.6    Legal Proceedings and Orders. Except as described on Schedule 5.6, other than in connection with the Bankruptcy Case, there is no action, suit, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding or any informal proceeding) or investigation pending or being heard by or before, or otherwise involving, any Governmental Authority or any arbitrator or arbitration panel (each a "Proceeding"), and no Person has threatened in writing to commence any Proceeding: (a) that relates to and would reasonably be expected to materially and adversely affect any of the Purchased Assets; (b) against or involving the Seller; or (c) that challenges, or that would reasonably be expected to have the effect of preventing, materially delaying, making illegal or otherwise materially interfering with, any of the transactions contemplated by this Agreement. Except as described on Schedule 5.6, there is no governmental order, writ, injunction, judgment or decree to which the Seller or any of the Purchased Assets, is subject.

        Section 5.7    Inventory. Schedule 2.1(c) lists all inventory of the Seller as of May 31, 2010, as determined in accordance with generally accepted accounting principles and the Seller's standard accounting practices. The information on Schedule 2.1(c) was derived from the books and records of the Seller and, taken as a whole, is accurate and complete in all material respects as of such date.

        Section 5.8    Accounts Receivable. Schedule 2.1(b) provides an aged report listing all Accounts Receivable of the Seller as of May 31, 2010, as determined in accordance with generally accepted accounting principles and the Seller's standard accounting practices. The information on Schedule 2.1(b) was derived from the books and records of the Seller, and, taken as a whole, is accurate and complete in all material respects as of such date.

        Section 5.9    Compliance with Legal Requirements. To the Knowledge of the Seller, it is in compliance with all Legal Requirements relating to the Purchased Assets (including the use thereof) and the conduct of the Business, except as set forth on Schedule 5.9.

        Section 5.10    Brokers. No Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by the Seller.

**ARTICLE VI**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

        The Buyer hereby represents and warrants to the Seller as follows:

        Section 6.1    Organization and Good Standing. The Buyer is duly organized, validly existing and in good standing under the laws of the State of Delaware.

Section 6.2    <u>Authority Relative to this Agreement</u>.  The Buyer has all corporate power and authority necessary to execute and deliver this Agreement and the other Transaction Documents to which it is party and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the other Transaction Documents to which the Buyer is party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by the board of directors of the Buyer, and no other corporate proceedings on the part of the Buyer are necessary to authorize this Agreement or the other Transaction Documents to which it is party or to consummate the transactions contemplated hereby or thereby.  This Agreement and the other Transaction Documents to which the Buyer is party have been duly and validly executed and delivered by the Buyer, and, assuming that this Agreement and such other Transaction Documents constitute valid and binding agreements of the Seller party thereto, constitute valid and binding agreements of the Buyer, enforceable against the Buyer in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

Section 6.3    <u>No Violation</u>.  Except for the entry and effectiveness of the Sale Order, neither the execution and delivery of this Agreement by the Buyer, nor the purchase by the Buyer of the Purchased Assets and the assumption by the Buyer of the Assumed Liabilities pursuant to this Agreement will (with or without notice or lapse of time) conflict with or result in any breach of any provision of the Buyer's Certificate of Incorporation or Bylaws.

Section 6.4    <u>Legal Proceedings and Orders</u>.  There is no pending Proceeding, and, to the Buyer's Knowledge, no Person has threatened to commence any Proceeding that could have a material adverse effect on the Buyer's ability to consummate the transactions contemplated hereby. There is no order, writ, injunction, judgment or decree to which the Buyer is subject that could have a material adverse effect on the Buyer's ability to consummate the transactions contemplated hereby.

Section 6.5    <u>Brokers</u>.  No Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by the Buyer.

**ARTICLE VII**
**COVENANTS OF THE PARTIES**

Section 7.1    <u>Conduct of Business</u>. (a)   Except as set forth in <u>Schedule 7.1</u>, as required by any order of the Bankruptcy Court (or as reasonably necessary in connection with the Bankruptcy Case or the Auction) or applicable law, as contemplated or required by the terms of any Transaction Document, or as otherwise consented to in writing by the Buyer (such consent not to be unreasonably withheld or delayed), during the period commencing on the date of this Agreement and continuing through the Closing or the earlier termination of this Agreement in accordance with its terms, the Seller shall: (i) operate its business in the usual, regular and ordinary course of business in all material respects (it being understood that such usual, regular and ordinary course may take into account the fact that the Business is being operated while in bankruptcy); (ii) use commercially reasonable efforts to preserve in all material respects its business, the Purchased Assets, its Employees and its operations; (iii) use commercially reasonable efforts to preserve in all material respects the goodwill and relationships with creditors, customers, licensees, lessors, suppliers, Employees and others having material business dealings with it; and (iv) confer regularly with the Buyer concerning material operational matters and otherwise report regularly to the Buyer concerning the status of the Business and Purchased Assets.   In addition, and notwithstanding (and without limiting) anything to the contrary contained herein, following the Bankruptcy Court's entry of an order identifying the Buyer as the successful bidder and until the Closing or the earlier termination of this Agreement, the Seller shall consult with the Buyer on all material aspects of the business and material decisions relating to the operations of its business and shall take into account the views of the Buyer with respect thereto.

(b)      Except as set forth in Schedule 7.1 or as required by any order of the Bankruptcy Court or applicable law or as contemplated or required by the terms of any Transaction Document, during the period commencing on the date of this Agreement and continuing through the Closing or the earlier termination of this Agreement in accordance with its terms, the Seller covenants that it will not, without the prior written consent of the Buyer, such consent not to be unreasonably withheld or delayed: (i) sell, lease (as lessor), transfer or otherwise dispose of (or permit to become subject to an Encumbrance (other than Permitted Encumbrances)) any assets of the type contemplated by the definition of Purchased Assets, other than: (A) the sale of inventory in the ordinary course of business; (B) the use of cash and cash equivalents to pay administrative expenses and as otherwise contemplated by this Agreement; (C) the collection of receivables in the ordinary course of business; (D) the use of prepaid assets and Documentary Materials in the ordinary course of business; and (E) the sale of obsolete inventory; (ii) change the terms of any accounts receivable (or other amounts receivable) owed to the Seller, expedite the collection of any accounts receivable (or other amounts receivable) and owed to the Seller, or factor any accounts receivable (or other amounts receivable) and owed to the Seller, except, in each case, for immaterial changes in the ordinary course of business; (iii) delay in any material respect the payment of any accounts payable of the type being assumed by the Buyer under this Agreement; (iv) materially change its credit policies; (v) make any payments in respect of indebtedness for borrowed money other than interest payments due pursuant to the terms thereof; (vi) in the case of all sales or licenses subsequent to the date hereof, provide for any customer or type of customer terms for sale or license that are materially inconsistent with current practices for such customer or type of customer; (vii) amend in any material and adverse respect or voluntarily terminate (or waive any material provision of) any Assumed Agreement; and (viii) except as required by applicable Legal Requirements or the Contracts and plans listed on Schedule 7.1(b), pay any bonus or similar payment to, or increase the amount of the wages, salary, commissions, fringe benefits or other compensation or remuneration payable to, any of its directors, officers or Employees.

Section 7.2      Access to and Delivery of Information; Maintenance of Records.

(a)      Between the date of this Agreement and the Closing Date, the Seller shall, during ordinary business hours, upon reasonable notice: (i) give the Buyer and the Buyer's Representatives reasonable access to the Seller's accountants, counsel, financial advisors and other authorized outside representatives, officers and senior management and, upon reasonable request, other Employees and all books, records and other documents and data, offices and other facilities of the Seller; (ii) permit the Buyer and the Buyer's Representatives to make such reasonable inspections and copies of all books, records and other documents of the Seller, as the Buyer may reasonably request; and (iii) furnish the Buyer with such financial and operating data and other information as the Buyer and the Buyer's Representatives may from time to time reasonably request.  All information obtained by the Buyer or the Buyer's Representatives pursuant to this Section 7.2 shall be subject to the terms of the Confidentiality Agreement.

(b)      Between the Closing Date and complete dissolution and liquidation of the Seller, the Buyer and the Buyer's Representatives shall have reasonable access to all of the Seller's books and records, including all information pertaining to the Assumed Agreements, in the possession of the Seller to the extent that: (i) such books, records and information relate to any period prior to the Closing Date; and (ii) such access may reasonably be required by the Buyer in connection with the Assumed Liabilities or the Excluded Liabilities, or other matters relating to or affected by the operation of the Seller's business and the Purchased Assets or tax matters relating to or affected by the ownership of the Purchased Assets or the operations of the Business prior to the Closing Date.  Such access shall be afforded by the Seller upon receipt of reasonable advance notice and during normal business hours.  If the Seller shall desire to dispose of any such books and records upon or prior to its dissolution, the Seller shall: (A) give the Buyer at least twenty (20) days prior written notice of such disposition; and (B) give the Buyer a reasonable opportunity, at the Buyer's expense, to segregate and remove such books and records as the Buyer may select and/or to copy such books and records as the Buyer may select.

1180005 v5/SF                                                    15

(c)     Between the Closing Date and complete dissolution and liquidation of the Seller, the Seller and the Seller's Representatives shall have reasonable access to all of the books and records of the Seller delivered to the Buyer at Closing, including all information pertaining to the Assumed Agreements to the extent that: (i) such books, records and information relate to any period prior to the Closing Date; and (ii) such access may reasonably be required by the Seller in connection with the Excluded Liabilities, the Excluded Assets or tax matters relating to or affected by the operation of Business.  Such access shall be afforded by the Buyer upon receipt of reasonable advance notice and during normal business hours.  In connection with such access, the Seller and Seller's Representatives shall use commercially reasonable efforts to minimize disruption to the Buyer's business; provided further that in connection with the Seller's and/or the Seller's Representatives' access to any offices and other facilities of the Buyer, the Seller and/or the Seller's Representatives shall be accompanied at all times by a representative of the Buyer unless the Buyer otherwise agrees, shall not materially interfere with the use and operation of such offices and other facilities, and shall comply with all reasonable safety and security rules and regulations for such offices and other facilities.  Following the Closing, all information obtained by the Seller or the Seller's Representatives pursuant to this Section 7.2 and all information included in the Purchased Assets shall be considered Confidential Information of the Buyer pursuant to the terms of the Confidentiality Agreement and the Seller shall continue to comply with the terms of the Confidentiality Agreement.

Section 7.3     <u>Expenses</u>.  Except to the extent specifically provided herein, in the Bidding Procedures Order or in the Sale Order, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such costs and expenses.

Section 7.4     <u>Further Assurances</u>.  Subject to the terms and conditions of this Agreement and until the complete dissolution and liquidation of the Seller, the consummation of a plan of reorganization of the Seller, or the earlier termination of this Agreement, the Seller and the Buyer shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Legal Requirements to consummate and make effective the sale of the Purchased Assets and assumption of the Assumed Liabilities in accordance with this Agreement.  The Seller shall use all commercially reasonable efforts to cause the conditions set forth in Sections 8.1 and 8.2 to be satisfied on a timely basis.  The Buyer shall use all commercially reasonable efforts to cause the conditions set forth in Sections 8.1 and 8.3 to be satisfied on a timely basis.  Neither the Seller, on the one hand, nor the Buyer, on the other hand, shall, without the prior written consent of the other, take any action that would reasonably be expected to prevent or materially impede, interfere with or delay the transactions contemplated by this Agreement.  From time to time, on or after the Closing Date until the dissolution and liquidation of the Seller, the Seller shall execute and deliver such documents to the Buyer as the Buyer may reasonably request in order to more effectively vest in the Buyer all of the Seller's right, title and interest to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).  In the event that any Purchased Asset shall not have been conveyed to the Buyer at the Closing, the Seller shall use commercially reasonable efforts to convey such Purchased Asset to the Buyer as promptly as is practicable after the Closing.

Section 7.5     <u>Governmental Authority Approvals and Cooperation</u>

(a)     <u>Governmental Authority Approvals</u>.  Prior to the Closing, the Seller and the Buyer shall use their commercially reasonable efforts to make any filings and notifications, and to obtain any Consents from Governmental Authorities, required to be made and obtained under applicable Legal Requirements in connection with the transactions contemplated by this Agreement (collectively, the "Regulatory Approvals") as promptly as practicable.

(b)     <u>Cooperation</u>.  Subject to any restrictions under applicable Legal Requirements, each party hereto: (i) shall cooperate with each other party hereto in connection with the filings and

Consents contemplated by Section 7.5(a); (ii) shall promptly inform each other party hereto of any communication received by such party from any Governmental Authority concerning this Agreement, the transactions contemplated hereby and any filing, notification or request for Consent related thereto; and (iii) shall permit each other party hereto to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto.

Section 7.6    Employee Matters.

(a)    Between the date of this Agreement and the Closing Date, the Seller shall reasonably assist the Buyer to engage, effective as of the Closing Date, in the Buyer's sole discretion, the services of those Seller's Employees identified and selected by the Buyer to be employed by the Buyer following the Closing ("Prospective Employees"), on terms and conditions satisfactory to the Buyer. At least two Business Days prior to the Closing Date, the Buyer shall provide the Seller with a list of any Prospective Employees to whom the Buyer intends to make an offer of employment (it being understood that the terms and conditions of any offer of employment shall be determined by the Buyer in its sole discretion). The Seller may terminate any Prospective Employee who does not become an employee of the Buyer within ten Business Days following the Closing Date.

(b)    The Seller alone shall remain liable: (i) for all unpaid wages, benefits, and commissions, unused vacation earned and/or accrued by such Employee; (ii) all obligations under the WARN Act or the Hawaii Dislocated Worker Law; and (iii) for severance obligations that arise as a result of the transactions contemplated by this Agreement.

(c)    If the Closing occurs, the Buyer shall assume Seller's Liability under Section 4980B of the Code ("COBRA"); provided, however, that, notwithstanding anything to the contrary in this Agreement, the Buyer shall not assume any Liability for making COBRA premium payments, except to the extent required by applicable Legal Requirements. Buyer hereby acknowledges that it will be a "successor employer" for purposes of Treasury Regulations Section 54.4980B-9.

Section 7.7    Taxes.    The Seller shall prepare and file all necessary Tax Returns and other documentation relating to Transfer Taxes and shall provide the Buyer a reasonable opportunity to review and comment on such Tax Returns (and in any event not fewer than five Business Days) prior to the filing thereof. The Buyer shall bear and pay any Transfer Taxes. The Buyer and the Seller shall cooperate with each other to the extent legally permitted to minimize any such Transfer Taxes. The Buyer shall, within 30 days after the Closing, provide the Seller with an allocation of the sum of the Purchase Price and the Assumed Liabilities (and any adjustments thereof) among the Purchased Assets as of the Closing Date (the "Allocation") in accordance with Section 1060 of the Code and the Treasury Regulations thereunder. Except as otherwise required by applicable Legal Requirements, the Buyer and the Seller shall report for all Tax purposes all transactions contemplated by this Agreement in a manner consistent with the Allocation, if any, and shall not take any position inconsistent therewith in any Tax Return, in any refund claim, in any litigation or otherwise.

Section 7.8    Submission for Bankruptcy Court Approval.    Within __ days of the execution of this Agreement (or as soon thereafter as is reasonably practicable but in no event later than May __, 2010), the Seller shall file a motion or motions (the "Motions") and supporting papers seeking: (i) the entry of the Bidding Procedures Order (including the scheduling of the Auction); (ii) the Bankruptcy Court's approval of this Agreement and the assumption (to the extent not already assumed by prior Bankruptcy Court order) and the assignment of the Assumed Agreements pursuant to section 365 of the Bankruptcy Code; and (iii) the entry of an order in the form of Exhibit C approving this Agreement, which order shall be a Final Order in a form and in substance reasonably acceptable to the Buyer and not subject to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Sale Order"). The Buyer shall take such actions as are reasonably requested by the Seller to assist the Seller in obtaining a finding by the Bankruptcy Court that the Buyer is deemed to have purchased the Purchased Assets in

good faith pursuant to section 363(m) of the Bankruptcy Code and that it has the necessary qualifications to show adequate assurance of future performance with respect to the Assumed Agreements as required by section 365 of the Bankruptcy Code. The Bidding Procedures Order and the Sale Order may, at the Seller's option, be sought under one combined set of motion papers, which shall be in form and substance reasonably acceptable to the Buyer. All parties hereto shall use their commercially reasonable efforts to have the Bankruptcy Court enter the Bidding Procedures Order within [__] Business Days following the filing of the motion therefor, to have the Sale Hearing no later than [__] days after the entry of the Bidding Procedures Order and to have the Sale Order entered no later than [__] days after the entry of the Bidding Procedures Order. The Seller shall give notice under the Bankruptcy Code of the request for the relief specified in the Motions to any Person as to whom the Seller has received notice that such Person has or may have, and to any Person whom to the Seller's Knowledge might assert, a claim against or with respect to, or interest in, any of the Purchased Assets or Assumed Liabilities, and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as the Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other proceedings relating to this Agreement or the transactions contemplated hereby. The Seller shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted, to the extent practicable, to the Buyer at least two Business Days prior to their filing with the Bankruptcy Court for the Buyer's prior review and approval, which shall not be unreasonably withheld or delayed.

       (a)  A list of the Assumed Agreements shall be filed as an exhibit to the Sale Motion, or, if required by the Bankruptcy Court, a motion to assume and assign the Assumed Agreements, and otherwise shall be described in sufficient detail to provide adequate notice to the non-debtor party to such Contracts. Upon revision of Schedule 2.1(e) by the Buyer, the Seller shall add any Assumed Agreements to the exhibit or remove Assumed Agreements from the exhibit, as applicable. Such exhibit shall set forth the amounts necessary to cure defaults under each of such Assumed Agreements as reasonably determined in good faith by the Seller. In cases in which the Seller is unable to establish that a default exists, the relevant cure amount shall be set at $0.00.

       (b)  The Seller shall promptly provide the Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court (and other courts) that the Seller has in its possession (or receives) pertaining to the motion for approval of the Bidding Procedures Order, the Sale Order or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the Bankruptcy Court's docket.

       (c)  If the Bidding Procedures Order, the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, Sale Order or other such order), subject to rights otherwise arising from this Agreement, the Seller shall use its commercially reasonable efforts to oppose such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion, in close consultation with the Buyer.

1180005 v5/SF     U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed  06/08/10   Page 61 of 70

Section 7.9     Overbid Procedures.  The Buyer and the Seller acknowledge that the Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of the Seller and other interested parties, providing information about the Seller's business to prospective bidders (subject to confidentiality agreements no less restrictive than the Confidentiality Agreement), entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an auction (the "Auction").  The Seller and the Buyer agree, and the motion to approve the Bidding Procedures Order shall reflect the fact that the provisions of this Agreement, including this Section 7.9 and Section 7.10, are reasonable, were a material inducement to the Buyer to enter into this Agreement and are designed to achieve the highest and best price for the Purchased Assets.

Section 7.10     Expense Reimbursement.  If: (a) (i) the Buyer is not identified as the successful bidder following completion of the actions contemplated by Section 7.9; (ii) at the time the successful bidder is identified, the Buyer is not in material breach of any material provision of this Agreement; (iii) the Buyer has not terminated this Agreement (other than pursuant to Sections 9.1(c), 9.1(e), 9.1(f), or 9.1(i)); and (iv) a sale of all or a material part of the Purchased Assets to a party or parties (collectively, a "Third-Party") other than the Buyer (the "Third-Party Sale") is consummated; (b) (i) a Third-Party Sale is consummated (whether in the Chapter 11 Case or, if converted into a case under Chapter 7 of the Bankruptcy Code, such Chapter 7 case) within six months of the approval of the Bidding Procedures Order; (ii) at the time of the Third-Party Sale, the Buyer is not in material breach of any material provision of this Agreement; and (iii) the Buyer has not terminated this Agreement (other than pursuant to Sections 9.1(c), 9.1(e), 9.1(f), 9.1(h) or 9.1(i)); or (c) the Seller files a Chapter 11 plan contemplating the sale or retention of a material portion of the Purchased Assets by the Seller in a manner substantially inconsistent with the terms of this Agreement (an "Inconsistent Plan"), then the Buyer will be entitled to receive, without further order of the Bankruptcy Court, from the Seller, or, in the event of a Third-Party Sale, out of the deposit from such Third-Party and the proceeds of the consummated sale: the amount of all of the Buyer's documented out-of-pocket expenses incurred in connection with its evaluation, consideration and negotiation of a possible transaction contemplated hereby, in any case up to $75,000 (the "Expense Reimbursement").   Such Expense Reimbursement shall be made by wire transfer of immediately available U.S. funds to an account designated by the Buyer from the Seller or, in the event of a Third-Party Sale, from the Seller, the deposit from such Third-Party and the proceeds of a Third-Party Sale, with such payment to be made on or before the first Business Day after the consummation of the Third-Party Sale or the filing of an Inconsistent Plan, as applicable.  The claim of the Buyer in respect thereof shall constitute a super-priority administrative expense claim, senior to all other administrative expense claims of the Seller, as administrative expenses under sections 503 and 507(b) of the Bankruptcy Code in the Chapter 11 Case, paid, in cash, from the deposit and/or the sale proceeds generated by the sale or sales of the Purchased Assets paid by a Third-Party Sale and paid to the Buyer, in cash.  As part of any motion seeking entry of the Bidding Procedures Order, the Seller shall seek approval by the Bankruptcy Court of this Section 7.10 (and that the substance of this Section 7.10 be in the Bid Procedures Order), which may be approved by the Bankruptcy Court separately from the remainder of this Agreement.

Section 7.11     Transfer of Purchased Assets.

(a) The Seller and the Buyer agree that unless otherwise requested by the Buyer in writing, any of the Purchased Assets (including software) that can be transmitted to the Buyer electronically will be so delivered to the Buyer promptly following the Closing and will not be delivered to the Buyer on any tangible medium.  Promptly following any electronic transmission, the Seller shall execute and deliver to the Buyer a certificate in a form reasonably acceptable to the Buyer and containing, at a minimum, the following information: (i) the date of transmission; (ii) the time the transmission was commenced and concluded; (iii) the name of the individual who made the transmission; (iv) the signature

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed  06/08/10   Page 62 of 70

of such individual; and (v) a general description of the nature of the items transmitted sufficient to distinguish the transmission from other transmissions.

(b) The Buyer will make all necessary arrangements for the Buyer to take possession of the Purchased Assets, and, at the Buyer's expense, to transfer same to a location operated by the Buyer as promptly as practicable following the Closing.

(c) After the Closing, if the Seller receives any payment, refund or other amount which is a Purchased Asset or which is otherwise properly due and owing to the Buyer, the Seller shall promptly remit, or shall cause to be remitted, such amount to the Buyer. The Seller shall promptly endorse and deliver to the Buyer any notes, checks, negotiable instruments or other documents which are Purchased Assets or otherwise properly due and owing to the Buyer, and the Buyer shall have the right and authority to endorse, without recourse, the name of the Seller on any such instrument or document.

Section 7.12    Post-Closing Operation of the Seller; Name Changes.  From and after the Closing, the Seller will cease all operations that are in any manner competitive with the Business being transferred to the Buyer hereunder.  Nothing contained herein shall preclude the Seller from conducting any non-competitive business activities, selling Excluded Assets or enforcing its rights and performing its obligations under this Agreement and the other Transaction Documents.  Promptly after the Closing, the Seller shall take all necessary action to change its name to a name bearing no resemblance to Hawaii Biotech, Inc. and will file such documents as are necessary to reflect such name change in the states in which the Seller is incorporated and the other jurisdictions where the Seller is qualified to do business as a foreign entity and filing an application with and obtaining an order from the Bankruptcy Court requiring a change to the caption of all pleadings and documents to be filed in the Chapter 11 Case from Hawaii Biotech, Inc. to a name bearing no resemblance to Hawaii Biotech, Inc.  The Seller agrees to promptly notify the Buyer of such name change and the name chosen by the Seller.  Notwithstanding the foregoing, the Seller may refer to Hawaii Biotech, Inc. as a former name for legal and noticing purposes in the Chapter 11 Case and other legal documents.

## ARTICLE VIII
## CONDITIONS TO CLOSING

Section 8.1    Conditions to Each Party's Obligations to Effect the Closing.  The respective obligations of each party to effect the sale and purchase of the Purchased Assets shall be subject to the fulfillment at or prior to the Closing of the following conditions:

(a)    no preliminary or permanent injunction or other order or decree by any Governmental Authority which prevents the consummation of the transactions contemplated hereby shall have been issued and remain in effect and no Legal Requirement shall have been enacted by any Governmental Authority which prohibits the consummation of the transactions contemplated hereby; and

(b)    the Bankruptcy Court shall have entered the Sale Order substantially in the form of Exhibit C and such Sale Order shall be a Final Order (except if modified or amended with the written consent of the Seller and the Buyer or as agreed to on the record at any hearing before the Bankruptcy Court).

Section 8.2    Conditions to Obligations of the Buyer.  The obligation of the Buyer to effect the purchase of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following additional conditions:

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed  06/08/10   Page 63 of 70

(a)    the Seller shall have performed and complied in all material respects with the other covenants contained in this Agreement which are required to be performed and complied with by it on or prior to the Closing Date;

(b)    each of the Seller's representations and warranties which are set forth in this Agreement shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except to the extent that any such representation or warranty speaks as of a particular date in which case such representation or warranty shall be true and correct in all respects as of such date); *provided, however*, that in determining the accuracy of such representations and warranties for purposes of this Section 8.2(b): (i) all materiality qualifications that are contained in such representations and warranties and that limit the scope of such representations and warranties shall be disregarded; and (ii) any inaccuracies in such representations and warranties shall be disregarded if the circumstances giving rise to all such inaccuracies (considered collectively) do not constitute, and would not reasonably be expected to have or result in, a Material Adverse Effect;

(c)    the Buyer shall have received a certificate from an authorized officer of the Seller, dated as of the Closing Date, to the effect that, to such officer's knowledge, the conditions set forth in Sections 8.2(a), 8.2(b), and 8.2(f) have been satisfied;

(d)    the Purchased Assets shall be able to be delivered free and clear of any Encumbrances other than Permitted Encumbrances;

(e)    the Buyer shall have received the other items to be delivered to it pursuant to Section 4.2; and

(f)    since the date of this Agreement, there shall have not have occurred any Material Adverse Effect, and no events, developments or effects shall have occurred (and no circumstances or conditions shall exist) that would reasonably be expected to have or result in a Material Adverse Effect.

Any condition specified in this Section 8.2 may be waived by the Buyer; *provided* that no such waiver shall be effective against the Buyer unless it is set forth in a writing executed by the Buyer.

Section 8.3    Conditions to Obligations of the Seller. The obligation of the Seller to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following additional conditions:

(a)    the Buyer shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by the Buyer on or prior to the Closing Date and the representations and warranties of the Buyer which are set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except to the extent that any such representation or warranty speaks as of a particular date in which case such representation or warranty shall be true and correct in all material respects as of such date);

(b)    the Seller shall have received a certificate from an authorized officer of the Buyer, dated as of the Closing Date, to the effect that, to such officer's knowledge, the conditions set forth in Section 8.3(a) have been satisfied; and

(c)    the Seller shall have received the other items to be delivered to it pursuant to Section 4.3.

Any condition specified in this Section 8.3 may be waived by the Seller; *provided* that no such waiver shall be effective against the Seller unless it is set forth in a writing executed by the Seller.

## ARTICLE IX
## TERMINATION AND ABANDONMENT

Section 9.1    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing by:

(a)    mutual written consent of the Seller and the Buyer;

(b)    the Seller if: (i) any of the Buyer's representations and warranties contained in this Agreement shall be inaccurate as of the date of this Agreement, or shall have become inaccurate as of a date subsequent to the date of this Agreement (as if made on and as of such subsequent date), such that the condition set forth in Section 8.3(a) would not be satisfied; or (ii) any of the Buyer's covenants or obligations contained in this Agreement shall have been breached such that the condition set forth in Section 8.3(a) would not be satisfied; *provided, however,* that if an inaccuracy in any of the Buyer's representations and warranties or a breach of a covenant or obligation by the Buyer is curable by the Buyer within ten Business Days after the date of written notice from the Seller to the Buyer of the occurrence of such inaccuracy or breach, then the Seller may not terminate this Agreement under this Section 9.1(b) on account of such inaccuracy or breach: (A) during the ten Business Day period commencing on the date on which the Buyer receives notice of such inaccuracy or breach; or (B) after such ten Business Day period if such inaccuracy or breach shall have been fully cured during such period in a manner that does not result in a material breach of any covenant or obligation of the Buyer;

(c)    the Buyer if: (i) any of the Seller's representations and warranties contained in this Agreement shall be inaccurate as of the date of this Agreement, or shall have become inaccurate as of a date subsequent to the date of this Agreement (as if made on and as of such subsequent date), such that the condition set forth in Section 8.2(b) would not be satisfied (it being understood that, in determining the accuracy of the representations and warranties referred to in Section 8.2(b) as of the date of this Agreement or as of any subsequent date for purposes of this Section 9.1(c), all materiality qualifications that are contained in such representations and warranties and that limit the scope of such representations and warranties shall be disregarded); or (ii) any of the Seller's covenants or obligations contained in this Agreement shall have been breached such that the condition set forth in Section 8.2(a) would not be satisfied; *provided, however,* that if an inaccuracy in any of the Seller's representations and warranties or a breach of a covenant or obligation by any of the Seller is curable by it within ten Business Days after the date of written notice from the Buyer to the Seller of the occurrence of such inaccuracy or breach, then the Buyer may not terminate this Agreement under this Section 9.1(c) on account of such inaccuracy or breach: (A) during the ten Business Day period commencing on the date on which the Seller receives notice of such inaccuracy or breach; or (B) after such ten Business Day period if such inaccuracy or breach shall have been fully cured during such period in a manner that does not result in a material breach of any covenant or obligation of the Seller;

(d)    the Seller or the Buyer, if: (i) there shall be any Legal Requirement (other than a Legal Requirement the violation of which could not reasonably be expected to result in: (A) criminal liability; or (B) fines or penalties in excess of $100,000) that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited; or (ii) consummation of the transactions contemplated hereby would violate any nonappealable final order, decree or judgment of the Bankruptcy Court or any court or Governmental Authority having competent jurisdiction; *provided* that the party seeking to terminate pursuant to this Section 9.1(d) shall have used its reasonable best efforts to challenge such Legal Requirement, order, decree or judgment;

(e)     the Buyer or the Seller, if the Bankruptcy Court enters an order approving a Third-Party Sale;

(f)     the Buyer, at any time on or after July __, 2010, if the Sale Order has not been entered by the Bankruptcy Court on the docket of the Bankruptcy Case; *provided* that the Buyer shall not be entitled to terminate this Agreement pursuant to this Section 9.1(f) if the breach by the Buyer of any representation, warranty or covenant contained in this Agreement is a proximate cause of the failure of the Sale Order to be entered by such date; or

(g)     the Seller, on or after July __, 2010, if the Sale Order has not been entered by the Bankruptcy Court on the docket of the Bankruptcy Case; *provided*, that the Seller shall not be entitled to terminate this Agreement pursuant to this Section 9.1(g) if its own breach of any representation, warranty or covenant contained in this Agreement is a proximate cause of the failure of the Sale Order to be entered by such date;

(h)     the Buyer, if the Closing shall not have occurred on or prior to the date fifteen Business Days following the date the Sale Order is entered by the Bankruptcy Court, or the Seller, if the Closing shall not have occurred on or prior to the date twenty Business Days following the date the Sale Order is entered by the Bankruptcy Court; *provided*, that the Buyer or the Seller, as the case may be, shall not be entitled to terminate this Agreement pursuant to this Section 9.1(h) if its own breach of any representation, warranty or covenant contained in this Agreement is a proximate cause of the failure of the Closing to occur on or prior to such date; or

(i)     the Buyer, if an Event of Default (as defined in the Post-Petition Loan) occurs under the Post-Petition Loan.

Section 9.2     <u>Procedure and Effect of Termination</u>.     In the event of termination of this Agreement and abandonment of the transactions contemplated hereby pursuant to Section 9.1, written notice thereof shall forthwith be given by the terminating party to the other party and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto *provided, however,* that: (a) no party shall be relieved of any Liability arising from any intentional breach by such party of any provision of this Agreement; and (b) Section 7.10 and Article X shall not be affected by the termination hereof.

Section 9.3     <u>Extension; Waiver</u>.     At any time prior to the Closing, the Seller, on the one hand, or the Buyer, on the other hand, may: (a) extend the time for the performance of any of the obligations or acts of the Buyer (in the case of an agreed extension by the Seller) or the Seller (in the case of an agreed extension by the Buyer); (b) waive any inaccuracies in the representations and warranties of the Buyer (in the case of a wavier by the Seller) or the Seller (in the case of a waiver by the Buyer) contained herein or in any document delivered pursuant hereto; (c) waive compliance with any of the agreements of the Buyer (in the case of a waiver by the Seller) or the Seller (in the case of a waiver by the Buyer) contained herein; or (d) waive any condition to its obligations hereunder.  Any agreement on the part of the Seller, on the one hand, or the Buyer, on the other hand, to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of the Seller or the Buyer, as applicable.

**ARTICLE X**
**MISCELLANEOUS PROVISIONS**

Section 10.1     <u>Amendment and Modification</u>.     This Agreement may be amended, modified or supplemented only by written agreement of the Seller and the Buyer.

Section 10.2     <u>Waiver of Compliance; Consents</u>.     Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant or condition herein may be waived by the party or parties entitled to the benefits thereof only by a written instrument signed

U.S. Bankruptcy Court - Hawaii   #09-02908   Dkt # 137   Filed  06/08/10   Page 66 of 70

by the party or parties granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, or condition shall not operate as a waiver of, or estoppel with respect to any subsequent or other failure.

Section 10.3    Survival.    The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties nor any of their respective officers, directors, representatives, employees, advisors or agents shall have any Liability to the other after the Closing for any breach thereof (it being understood that nothing in this Section 10.3 shall impact any remedy available to any party hereto in the event of fraud). The parties hereto agree that only the covenants contained in this Agreement to be performed at or after the Closing Date shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing Date for any breach thereof.

Section 10.4    Notices.    All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given or made as follows: (a) if sent by registered or certified mail in the United States return receipt requested, upon receipt; (b) if sent designated for overnight delivery by nationally recognized overnight air courier (such as Federal Express), two business days after delivery to such courier; (c) if sent by facsimile transmission before 5:00 p.m. in Hawaii, when transmitted and receipt is confirmed; (d) if sent by facsimile transmission after 5:00 p.m. in Hawaii and receipt is confirmed, on the following Business Day; (e) if sent by electronic mail transmission before 5:00 p.m. in Hawaii, upon receipt; (f) if sent by electronic mail transmission after 5:00 p.m. in Hawaii, on the following Business Day; and (g) if otherwise actually personally delivered, when delivered, provided that such notices, requests, demands and other communications are delivered to the address set forth below, or to such other address as any party shall provide by like notice to the other parties to this Agreement:

    (a)  If to the Seller, to:

        [c/o the Seller]

        _____

        Phone:
        Facsimile:
        Email address:
        Attention:

        with a copy to:

        **[Debtor's Counsel]**

    (b)  If to the Buyer, to:

        _____

        _____

        Phone:
        Facsimile:
        Email address:
        Attention:

with a copy to:

**Buyer's Counsel**

Section 10.5    Assignment.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, including, in the case of the Seller, the Seller's trustee in the Bankruptcy Case; *provided, however*, that: (a) prior to the Closing Date, neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, including by operation of law, without the prior written consent of the other parties hereto; and (b) that this Agreement shall be assignable by the Buyer, without the prior written consent of the Seller, so long as the Buyer shall continue to remain obligated hereunder. Any assignment of this Agreement or any of the rights, interests or obligations hereunder in contravention of this Section 10.5 shall be null and void and shall not bind or be recognized by the Seller or the Buyer.

Section 10.6    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 10.7    Governing Law.  This Agreement shall be governed by the laws of the State of Hawaii, without giving effect to the principles of conflicts of laws thereof.

Section 10.8    Submission to Jurisdiction.  Unless and to the extent otherwise specifically provided herein, the parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby.  Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such courts.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute or proceeding brought in such courts or any defense of inconvenient forum in connection therewith.

Section 10.9    Counterparts.  This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which, when executed and delivered, shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Facsimile and electronically transmitted signatures shall be deemed to be, and shall be legally effective as, original signatures for all purposes of this Agreement.

Section 10.10    Incorporation of Schedules and Exhibits.  All Schedules and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

Section 10.11    Entire Agreement.  This Agreement (including all Schedules and all Exhibits), the Transaction Documents, and the Confidentiality Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior and contemporaneous agreements and understandings, written and oral, among the parties with respect thereto.

1180005 v5/SF

Section 10.12    Remedies.  The parties hereby acknowledge and agree that money damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement and that, in such event, each party or its respective successors or assigns may, in addition to any other rights and remedies existing in their favor, apply to the Bankruptcy Court or any other court of competent jurisdiction for specific performance, injunctive and/or other relief in order to enforce or prevent any violations of this Agreement.

Section 10.13    Headings.  The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

*   *   *   *   *

1180005 v5/SF

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**HAWAII BIOTECH, INC.**

By:_____
      Name:
      Title:


**HBI ACQUISITION CORP.**

By:_____
      Name:
      Title:

1180005 v5/SF